EXHIBIT "A"

EXECUTION VERSION



AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of

March 9, 2007

Among

SOUTH EDGE, LLC

The Lenders Party Hereto

And

JPMORGAN CHASE BANK, N.A.
as Administrative Agent

and

THE ROYAL BANK OF SCOTLAND PLC
as Syndication Agent

J.P. MORGAN SECURITIES INC.,
as Sole Bookrunner and Sole Lead Arranger

CHI 3741503v.7

TABLE OF CONTENTS

ARTICLE I

Definitions

SECTION 1.01. Defined Terms ................................................................................................. 1
SECTION 1.02. Classification of Loans and Borrowings.................................................... 27
SECTION 1.03. Terms Generally ............................................................................................ 27
SECTION 1.04. Accounting Terms; GAAP ........................................................................... 28

ARTICLE II

The Credits

SECTION 2.01. Commitments................................................................................................. 28
SECTION 2.02. Loans and Borrowings................................................................................. 29
SECTION 2.03. Requests for Borrowings ............................................................................. 30
SECTION 2.04. Intentionally Omitted.................................................................................... 31
SECTION 2.05. Intentionally Omitted.................................................................................... 31
SECTION 2.06. Letters of Credit............................................................................................ 31
SECTION 2.07. Funding of Borrowings................................................................................ 35
SECTION 2.08. Interest Elections. ......................................................................................... 35
SECTION 2.09. Termination of Commitments; Reduction of Facility D Commitments............ 37
SECTION 2.10. Repayment of Loans; Evidence of Debt..................................................... 37
SECTION 2.11. Prepayment of Loans.................................................................................... 38
SECTION 2.12. Fees................................................................................................................. 39
SECTION 2.13. Interest. .......................................................................................................... 41
SECTION 2.14. Alternate Rate of Interest............................................................................. 42
SECTION 2.15. Increased Costs.............................................................................................. 42
SECTION 2.16. Break Funding Payments.............................................................................. 43
SECTION 2.17. Taxes............................................................................................................... 44
SECTION 2.18. Payments Generally; Pro Rata Treatment; Sharing of Set-offs. ........... 45
SECTION 2.19. Mitigation Obligations; Replacement of Lenders..................................... 47

ARTICLE III

Representations and Warranties

SECTION 3.01. Organization; Powers.................................................................................... 48
SECTION 3.02. Authorization; Enforceability ...................................................................... 48
SECTION 3.03. Governmental Approvals; No Conflicts..................................................... 48
SECTION 3.04. No Material Adverse Change ....................................................................... 48
SECTION 3.05. Properties........................................................................................................ 48
SECTION 3.06. Litigation........................................................................................................ 49

Table of Contents
(continued)

Page

SECTION 3.07.  Compliance with Laws and Agreements ............................................ 49
SECTION 3.08.  Investment Company Act .................................................................. 49
SECTION 3.09.  Taxes ................................................................................................. 49
SECTION 3.10.  ERISA ............................................................................................... 49
SECTION 3.11.  Disclosure ......................................................................................... 50
SECTION 3.12.  Environmental Matters ..................................................................... 50
SECTION 3.13.  Permits, Zoning, Governmental Approvals, Etc. .............................. 50
SECTION 3.14.  Collateral ........................................................................................... 51
SECTION 3.15.  Project Agreements ........................................................................... 51
SECTION 3.16.  Solvency ............................................................................................ 51
SECTION 3.17.  Advances under Original Credit Agreement ..................................... 51
SECTION 3.18.  Operating Agreement ........................................................................ 51

## ARTICLE IV

### Conditions and Limitations

SECTION 4.01.  Closing Date ...................................................................................... 52
SECTION 4.02.  Each Credit Event ............................................................................. 53
SECTION 4.03.  Conditions to First Loan ................................................................... 54
SECTION 4.04.  Additional Conditions to Loans ........................................................ 56
SECTION 4.05.  Intentionally Omitted ........................................................................ 57
SECTION 4.06.  Limitations ........................................................................................ 57

## ARTICLE V

### Construction and Related Provisions

SECTION 5.01.  Performance and Completion of Project ............................................ 59
SECTION 5.02.  Entitlements ....................................................................................... 60
SECTION 5.03.  LID Bonds. ........................................................................................ 60
SECTION 5.04.  Construction Delays ........................................................................... 60
SECTION 5.05.  Construction Responsibilities ........................................................... 60
SECTION 5.06.  Correction of Defects ........................................................................ 61
SECTION 5.07.  Compliance with Agreements ........................................................... 61
SECTION 5.08.  No Changes or Amendments ............................................................ 61
SECTION 5.09.  Loan Balancing .................................................................................. 61
SECTION 5.10.  Proceedings to Enjoin or Prevent Construction ............................... 62
SECTION 5.11.  The Administrative Agent's and the Lenders' Actions for Their Own Protection
Only .............................................................................................................................. 62
SECTION 5.12.  Inspections; Construction Consultant ............................................... 63
SECTION 5.13.  Contractor Construction Information ................................................ 63
SECTION 5.14.  Prohibited Contracts .......................................................................... 63

Table of Contents
(continued)

Page

SECTION 5.15. Hold Disbursements of Loans in Trust ................................................................. 63
SECTION 5.16. The Administrative Agent's Verification of Subcontracts ................................. 64
SECTION 5.17. Limited Nature of Waivers of Requirements ..................................................... 64

## ARTICLE VI

### Affirmative Covenants

SECTION 6.01. Financial Statements and Other Information ...................................................... 64
SECTION 6.02. Notices of Material Events ................................................................................. 65
SECTION 6.03. Existence; Conduct of Business ......................................................................... 66
SECTION 6.04. Payment of Obligations ..................................................................................... 66
SECTION 6.05. Maintenance of Properties; Insurance .............................................................. 66
SECTION 6.06. Books and Records; Inspection Rights .............................................................. 66
SECTION 6.07. Compliance with Laws ...................................................................................... 66
SECTION 6.08. Use of Proceeds and Letters of Credit .............................................................. 66
SECTION 6.09. Taxes and Fees on Loan Documents ................................................................ 67
SECTION 6.10. Environmental Notices ...................................................................................... 67
SECTION 6.11. Insurance with Respect to Project ..................................................................... 67
SECTION 6.12. Environmental Audits ........................................................................................ 68
SECTION 6.13. Insurance and Condemnation Proceeds ............................................................ 69
SECTION 6.14. Appraisals .......................................................................................................... 69
SECTION 6.15. Collateral ........................................................................................................... 69
SECTION 6.16. Subdivision Maps; Other Encumbrances .......................................................... 70
SECTION 6.17. Further Assurances ............................................................................................ 71
SECTION 6.18. Interest Reserve ................................................................................................. 71

## ARTICLE VII

### Negative Covenants

SECTION 7.01. Indebtedness ....................................................................................................... 71
SECTION 7.02. Liens .................................................................................................................... 71
SECTION 7.03. Fundamental Changes; Sales; Releases; and Release Price ............................... 71
SECTION 7.04. Investments, Loans, Advances, Guarantees and Acquisitions .......................... 75
SECTION 7.05. Swap Agreements ............................................................................................... 75
SECTION 7.06. Restricted Payments ........................................................................................... 75
SECTION 7.07. Transactions with Affiliates ............................................................................... 76
SECTION 7.08. Restrictive Agreements ...................................................................................... 76
SECTION 7.09. Organizational Documents ................................................................................. 76
SECTION 7.10. General Manager ................................................................................................. 76
SECTION 7.11. Construction Manager ......................................................................................... 76
SECTION 7.12. Principal Project Engineer .................................................................................. 76

Table of Contents
(continued)

## ARTICLE VIII

### Special Entity Provisions

SECTION 8.01. SPE Covenants.................................................................................................. 77

## ARTICLE IX

### Events of Default; Remedies

SECTION 9.01. Events of Default ............................................................................................. 79
SECTION 9.02. All Remedies .................................................................................................... 82
SECTION 9.03. Construction...................................................................................................... 82
SECTION 9.04. Enforcement...................................................................................................... 83
SECTION 9.05. Cash Collateral Account.................................................................................. 83
SECTION 9.06. Qualified Letters of Credit ............................................................................. 84
SECTION 9.07. Cure of Member Defaults. .............................................................................. 85
SECTION 9.08. Application of Payments.................................................................................. 86

## ARTICLE X

### The Administrative Agent

SECTION 10.01. Appointment of Administrative Agent ........................................................... 87
SECTION 10.02. Administrative Agent's Rights as a Lender.................................................... 87
SECTION 10.03. Administrative Agent's Duties ...................................................................... 88
SECTION 10.04. Reliance .......................................................................................................... 88
SECTION 10.05. Sub-Agents ..................................................................................................... 88
SECTION 10.06. Resignation ..................................................................................................... 89
SECTION 10.07. Credit Analysis and Decision by Lenders .................................................... 89
SECTION 10.08. Collateral......................................................................................................... 89

## ARTICLE XI

### Miscellaneous

SECTION 11.01. Notices............................................................................................................. 90
SECTION 11.02. Waivers; Amendments.................................................................................... 91
SECTION 11.03. Expenses; Indemnity; Damage Waiver. ....................................................... 93
SECTION 11.04. Successors and Assigns .................................................................................. 94
SECTION 11.05. Survival........................................................................................................... 98
SECTION 11.06. Counterparts; Integration; Effectiveness ..................................................... 98
SECTION 11.07. Severability...................................................................................................... 98
SECTION 11.08. Right of Setoff................................................................................................. 98

## Table of Contents
### (continued)

Page

SECTION 11.09.  Governing Law; Jurisdiction; Consent to Service of Process. ........................99
SECTION 11.10.  WAIVER OF JURY TRIAL ............................................................................99
SECTION 11.11.  Headings ....................................................................................................100
SECTION 11.12.  Confidentiality ...........................................................................................100
SECTION 11.13.  USA PATRIOT ACT ...................................................................................100
SECTION 11.14.  Ratification .................................................................................................100
SECTION 11.15.  Lenders ......................................................................................................100

# TABLE OF CONTENTS

## SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule 1 | Facility A and D Lenders and Commitments |
| Schedule 2 | Members, Parent Guarantors and Related Information |
| Schedule 3 | Disclosed Matters |
| Schedule 4 | Intentionally Omitted |
| Schedule 5 | Parent Guarantor Financial Covenants |
| Schedule 6 | Legal Description of Project |
| Schedule 7 | Scope of Work |
| Schedule 8 | Project Agreements |
| Schedule 9 | Required Insurance |
| Exhibit A | Assignment and Assumption |
| Exhibit B | Intentionally Omitted |
| Exhibit C | Intentionally Omitted |
| Exhibit D | Project Budget |
| Exhibit E | Consent and Agreement |
| Exhibit F | Deed of Trust Amendment |
| Exhibit G | Draw Request Form |

AMENDED AND RESTATED CREDIT AGREEMENT dated as of March 9, 2007, among SOUTH EDGE, LLC, a Nevada limited-liability company, the Lenders party hereto, and JPMORGAN CHASE BANK, N.A. as Administrative Agent.

## RECITALS

A.     The Borrower, Administrative Agent and certain lenders have entered into a Credit Agreement dated November 1, 2004 (the "Original Credit Agreement").

B.     Pursuant to the Original Credit Agreement, the Borrower has requested (1) the Facility A Increase (as defined therein) increasing Facility A by $50,000,000 to $160,000,000 and (2) a one-year extension of the maturity of Facility A, and by their execution hereof the Facility A Lenders (as herein defined) have agreed thereto.

C.     The Borrower and the Required Lenders (as defined in the Original Credit Agreement) have also agreed to certain other changes to the Original Credit Agreement set forth herein.

NOW, THEREFORE, the Borrower, the Administrative Agent and Lenders signatory hereto (including all of the Facility A Lenders) constituting Required Lenders hereby amend and restate the Original Credit Agreement as follows:

## ARTICLE I

### Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquisition Agreement" means, with respect to any Member, that certain Purchase and Sale Agreement and Joint Escrow Instructions dated October 29, 2004 between the Borrower and such Member, and co-signed by such Member's Parent Guarantor, as amended by a First Amendment thereto dated November 28, 2006 and a Second Amendment thereto dated the date hereof, providing for the purchase by such Member of the Phases designated in such agreement for the applicable Takedown Price, as such agreement may be further supplemented, amended or modified from time to time in accordance with the provisions of this Agreement.

"Adjusted Gross Acreage" means, with respect to any Phase, the "Adjusted Gross Acreage" of such Phase as determined from time to time pursuant to the Acquisition Agreement that governs the purchase and sale of such Phase.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of

1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted Pro Rata Share" means, with respect to any Member, a percentage equal to the Original Pro Rata Share of such Member, (a) plus or minus adjustments thereto in connection with changes to the Adjusted Gross Acreage of a Member in accordance with its Acquisition Agreement as a result of the finalization of the Planning Area Parcel Map and (b) plus the Original Pro Rata Share (or portion thereof) of any Defaulting Member (as adjusted pursuant to clause (a) above) acquired by such Member pursuant to a Key Member Acquisition. The Adjusted Pro Rata Share shall never be less than the Original Pro Rata Share (as adjusted pursuant to clause (a) above).

"Administrative Agent" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Facility A Commitment" means the Facility A Commitments of all of the Facility A Lenders in the aggregate amount of $160,000,000, as such amount may be reduced or increased pursuant to the terms of this Agreement.

"Aggregate Facility D Commitment" means the Facility D Commitments of all of the Facility D Lenders in the aggregate amount of $25,000,000, as such amount may be reduced from time to time pursuant to the terms of this Agreement.

"Aggregate Facility D Outstanding Credit Exposure" means, at any time, the aggregate of the Facility D Outstanding Credit Exposure of all Facility D Lenders.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Base CD Rate in effect on such day plus 1% and (c) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate, respectively.

"Applicable Percentage" means at any time (a) (subject to the next succeeding sentence) with respect to any Facility A Lender, the percentage of the Aggregate Facility A Commitment then represented by such Lender's Facility A Commitment, (b) with respect to any Facility B Lender, the percentage of all outstanding Facility B Loans then represented by such Lender's outstanding Facility B Loans, (c) with respect to any Facility C Lender, the percentage of all outstanding Facility C Loans then represented by such Lender's outstanding Facility C Loans, (d) (subject to the next succeeding sentence) with respect to any Facility D Lender, the percentage of the Aggregate Facility D Commitment then represented by such Lender's Facility

D Commitment and (e) (subject to the next succeeding sentence) with respect to a Lender and all Facilities, the percentage of (i) the sum of the Aggregate Facility A Commitment, all outstanding Facility B Loans and Facility C Loans and the Aggregate Facility D Commitment then represented by (ii) the sum of such Lender's Facility A Commitment, outstanding Facility B Loans and Facility C Loans and Facility D Commitment. If the Aggregate Facility A Commitment or Aggregate Facility D Commitment has terminated, the Applicable Percentage shall be determined in each case based upon the outstanding Facility A Loans (in the case of termination of the Aggregate Facility A Commitment) or Facility D Outstanding Credit Exposure (in the case of termination of the Aggregate Facility D Commitment).

"Applicable Rate" means, for any day, with respect to any ABR Loan, Eurodollar Loan or Letter of Credit, as the case may be, under a Facility, the applicable rate per annum set forth below under the caption "ABR Spread," or "Eurodollar Spread" or "Applicable Rate for Letters of Credit" with respect to such Facility, as the case may be:

| Facility : | ABR Spread | Eurodollar Spread | Applicable Rate for Letters of Credit |
|---|---|---|---|
| Facility A | 0% | 1.75% | Not Applicable |
| Facility B | 0% | 1.75% | Not Applicable |
| Facility C | 0.25% | 2.00% | Not Applicable |
| Facility D | 0.25% | 2.00% | 2.00% |

"Application for Payment and Sworn Statement" means the certificate and application for payment and sworn statement to be executed by the Project Contractor in connection with progress payment applications under the Project Contract or by the Construction Manager in connection with payments under the Construction Management Agreement, in each case in a form reasonably satisfactory to the Administrative Agent, which certificate and application shall include certifications as to the following matters: (A) the aggregate Hard Costs incurred to date for the Project and the estimated remaining Hard Costs to be paid for the Project, in each case pursuant to the Project Contract or Construction Management Agreement (as applicable), (B) all retainage amounts, (C) the percentage completion of the construction of the Project and the conformance of such construction substantially in accordance with the Approved Plans and Specifications, (D) that the sum requested in the current Application for Payment and Sworn Statement represents costs payable pursuant to the Project Contract and actually incurred by the Project Contractor or pursuant to the Construction Management Agreement and actually incurred by the Construction Manager, and (E) that the work and materials for which payment is requested have been performed and incorporated into the Project substantially in accordance with the Approved Plans and Specifications.

"Appraisal" means a written appraisal of the Project, which appraisal is satisfactory to, and prepared by an independent appraiser engaged directly by, the Administrative Agent, and satisfies the requirements of the Financial Institutions Reform, Recovery and Enforcement Act, as amended, and the regulations promulgated thereunder, if applicable (which

3

appraisal may be an updated version of a prior Appraisal), together with evidence of compliance with applicable federal regulations governing loans in areas having special flood hazards.

"Approved Development Costs" means the Development Costs identified by line item category and dollar amount in the Approved Project Budget.

"Approved Fund" has the meaning assigned to such term in Section 11.04.

"Approved Plans and Specifications" is defined in Section 4.03(a).

"Approved Project Budget" means the budget for the Project attached hereto as Exhibit D and any Modifications thereto that are either Permitted Modifications or approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Approved Project Schedule" means the schedule for the Project approved by the Administrative Agent and any Modifications thereto that are either Permitted Modifications or approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Approved Swap Agreement" is defined in Section 7.05.

"Assessment Rate" means, for any day, the annual assessment rate in effect on such day that is payable by a member of the Bank Insurance Fund classified as "well-capitalized" and within supervisory subgroup "B" (or a comparable successor risk classification) within the meaning of 12 C.F.R. Part 327 (or any successor provision) to the Federal Deposit Insurance Corporation for insurance by such Corporation of time deposits made in dollars at the offices of such member in the United States; provided that if, as a result of any change in any law, rule or regulation, it is no longer possible to determine the Assessment Rate as aforesaid, then the Assessment Rate shall be such annual rate as shall be determined by the Administrative Agent to be representative of the cost of such insurance to the Lenders.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Assignment of Acquisition Agreements" means that certain Assignment of and Agreement with Respect to Acquisition Agreements dated November 1, 2004 executed by the Borrower, the Members, the Parent Guarantors and the Administrative Agent, as supplemented by the Consent and Agreement.

"Assignment of Contracts" means that certain Assignment of Contracts, Permits and Plans and Specifications dated November 1, 2004 executed by the Borrower.

"Balancing Notice" is defined in Section 5.09.

"Balancing Payment" is defined in Section 5.09.

4

"Base CD Rate" means the sum of (a) the Three-Month Secondary CD Rate multiplied by the Statutory Reserve Rate plus (b) the Assessment Rate.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means South Edge, LLC, a Nevada limited-liability company.

"Borrower's Application for Payment" means the certificate and application for payment to be executed by the Borrower in connection with each request for a disbursement of Loans, in a form reasonably satisfactory to the Administrative Agent, which application shall include certifications as to the following matters: (A) the aggregate Approved Development Costs incurred to date and the estimated remaining Approved Development Costs to be paid, (B) all retainage amounts, and (C) that the sum requested in the current Draw Request Form represents Approved Development Costs included in the Approved Project Budget and actually incurred by the Borrower.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date under the same Facility and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Collateral Account" means an account maintained with the Administrative Agent pursuant to this Agreement and over which the Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal.

"Change in Control" means the occurrence of any one or more of the following events:

    (a)    With respect to any Member, that such Member shall cease to own its Adjusted Pro Rata Share of the membership interests in the Borrower (other than by reason of a Key Member Acquisition), free and clear of any Liens other than Permitted

Encumbrances or Liens in favor of another Member pursuant to the Operating Agreement; or

     (b)    In the case of any Member (other than Focus), that such Member shall cease to be wholly owned, directly or indirectly, by its Parent Guarantor; or

     (c)    In the case of Focus, that (i) John A. Ritter, lineal descendants of John A. Ritter and trusts controlled by John A. Ritter or his lineal descendants shall, in the aggregate, cease to own, directly or indirectly, beneficially at least twenty-five percent (25%) of the equity interests in Focus or (ii) other than by reason of death or disability, John A. Ritter shall cease to exercise primary management responsibilities with respect to the operations of Focus.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Bank (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"City" means the City of Henderson, Nevada.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, at any time, any assets that are subject to a security interest or other Lien in favor of the Administrative Agent for the benefit of the Holders of Secured Obligations.

"Collateral Documents" means the Deed of Trust, the Assignments of Contracts, the Assignment of Acquisition Agreements and any other documents from time to time executed by Borrower, granting the Administrative Agent, for the benefit of Holders of Secured Obligations, a Lien securing the Secured Obligations.

"Commitment" means the Facility A Commitment, Facility B Commitment, Facility C Commitment or Facility D Commitment (as the case may be).

"Common Areas" means private streets, sidewalks, access ways, drainage and retention areas or other private common areas, infrastructure or improvements intended to be conveyed to and owned by a Development Association for the benefit of all or any portion of the Project.

"Completion Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Completion Guaranty dated November 1, 2004 executed and delivered by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

6

"Consent and Agreement" means the Consent and Agreement executed by the Guarantors and Administrative Agent substantially in the form attached hereto as Exhibit E.

"Construction Agreements" is defined in Section 4.03(h).

"Construction Consultant" means, collectively, the architect(s), engineer(s) and any other consultant(s) engaged by the Administrative Agent from time to time to review plans and specifications, construction and other matters relating to the Project.

"Construction Management Agreement" is defined in Section 4.03(e).

"Construction Manager" means Landtek, LLC, a Nevada limited-liability company and Affiliate of the General Manager, or any Person that shall succeed it, as construction manager with respect to the construction of the Improvements, in accordance with the provisions of this Agreement.

"Contingent Obligation" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Contingent Obligation shall not include endorsements for collection or deposit in the ordinary course of business.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Corporate Guarantor" means each of the Parent Guarantors, except John A. Ritter.

"Credit Parties" means the Borrower and the Guarantors; "Credit Party" means any of the Credit Parties.

"Customary Real Estate Encumbrances" means declarations, covenants, restrictions, easements, zoning restrictions, rights-of-way, and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not materially detract from the value of the affected portion of the Project or interfere with the development or improvement of the Project or the ordinary conduct of business of the Borrower.

"Date Down Endorsement" is defined in Section 4.04(f).

"Deed of Trust" means the deed of trust executed by the Borrower dated November 1, 2004 and recorded November 1, 2004 in Book 20041101 as Document No. 0006330 in Clark County, Nevada, granting to the trustee thereunder, and in favor of the Administrative Agent (as beneficiary), for the benefit of the Holders of Secured Obligations, a first Lien on the Project as security for the Secured Obligations, subject only to Permitted Encumbrances, as amended by the Deed of Trust Amendment.

"Deed of Trust Amendment" means the First Amendment to Deed of Trust executed by the Borrower and the Administrative Agent substantially in the form of Exhibit F attached hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Member" means a Member with respect to which a Member Default has occurred and is continuing or with respect to whose Parent Guarantor a Member Default has occurred and is continuing.

"Defaulting Member's Remaining Obligations" means, at any time, an amount (as reasonably determined by the Administrative Agent) equal to the sum of (i) such Defaulting Member's Adjusted Pro Rata Share of Approved Development Costs not yet paid (less its Adjusted Pro Rata Share of the sum of the amounts of (i) the undisbursed portion of the Aggregate Facility A Commitment and (ii) the Facility D Loan Availability), plus (ii) without duplication, an amount equal to the Takedown Prices of the Phases not yet acquired by such Defaulting Member pursuant to its Acquisition Agreement.

"Development Agreement" means, collectively, one or more development agreements between the Borrower and the City providing for development of the Project as a master plan community and approved by the Administrative Agent, as amended or modified from time to time with the written approval of the Administrative Agent, which approval shall not be unreasonably withheld or delayed.

"Development Association" means any homeowner's association, development association or other similar entity formed for the benefit of the Project or any portion thereof.

"Development Costs" means all costs incurred by the Borrower in connection with the construction of the Improvements, including (a) the cost of labor and materials (collectively, the "Hard Costs") and (b) all so-called "soft costs" (collectively, the "Soft Costs"), including (i) fees and charges of the Construction Manager, Project Engineer and all other engineers and other consultants engaged by the Borrower, and the costs and fees incurred in connection with the procurement of all Permits necessary to complete the Project, (ii) all interest payments on the Loans and LC Disbursements, all fees payable under this Agreement and any periodic payments under any Approved Swap Agreement (but not payments due upon default, termination or breakage) and (iii) real estate taxes, insurance premiums and other carrying costs for the Project; provided, that under no circumstances shall Development Costs include (A) any

8

principal or interest payments on Indebtedness other than as specified in clause (ii) above, (B) any Restricted Payments or other payments to Members of Borrower or any Affiliate of Borrower or of any such Member (except Permitted Affiliate Fees).

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.

"dollars" or "$" refers to lawful money of the United States of America.

"Draw Request Form" means the form of Request for Loan Advance attached hereto as Exhibit G, as the same may be revised from time to time with the consent of the Borrower and the Administrative Agent.

"Entitlement Proceeding" is defined in Section 3.13(b).

"Environmental, Health or Safety Requirements of Law" means all Requirements of Law derived from or relating to foreign, federal, state and local laws or regulations or common law theories relating to or addressing pollution or protection of the environment, or protection of worker health or safety, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., in each case including any amendments thereto, any successor statutes, and any regulations or guidance promulgated thereunder, and any state or local equivalent thereof.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement dated November 1, 2004 executed by Borrower.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental, Health or Safety Requirements of Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Report" means a "Phase I" environmental assessment, or equivalent report as approved by the Administrative Agent, and, if required by the Administrative Agent, a "Phase II" environmental site assessment, in each case prepared by an environmental engineering consultant, and in form and substance, satisfactory to the Administrative Agent in its reasonable judgment.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 9.01.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.19(b)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.17(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.17(a).

10

"Facilities" means Facility A, Facility B, Facility C and Facility D; provided, however, that, if the context indicates that reference to less than all of Facility A, Facility B, Facility C and Facility D is intended, "Facilities" shall mean only such of Facility A, Facility B, Facility C and Facility D as is so intended.

"Facility A" means the loan facility described in Section 2.01(a).

"Facility A Commitment" means, for each of the Facility A Lenders, the obligation of such Facility A Lender to make Loans under Facility A in the aggregate not exceeding the amount set forth in Schedule 1 hereto as its "Facility A Commitment" or the amount set forth in any Assignment and Assumption Agreement by which such Facility A Lender acquires an interest in Facility A, as such applicable amount may be increased or decreased from time to time pursuant to the terms hereof.

"Facility A Lender" means, at any time, each of the Lenders holding an interest in Facility A.

"Facility A Maturity Date" means October 31, 2008 or such earlier date upon which the outstanding principal amount of the Facility A Loans, all accrued and unpaid interest thereon, and all other Facility A Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility A Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility A Loans, all accrued and unpaid fees with respect to Facility A and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility A Lenders or to any Facility A Lender, the Administrative Agent or any indemnified party with respect to Facility A under the Loan Documents.

"Facility B" means the term loan facility described in Section 2.01(b).

"Facility B Commitment" means, for each of the Facility B Lenders as of the Closing Date, the amount of the Facility B Loan held by such Facility B Lender on the Closing Date. Notwithstanding the reference to the "Commitment" of the Facility B Lenders, the Facility B Loans were fully disbursed under the Original Credit Agreement, and no Facility B Lender has any obligation to make any advances under Facility B.

"Facility B Lender" means, at any time, each of the Lenders holding an interest in Facility B.

"Facility B Maturity Date" means October 31, 2007 or such earlier date upon which the outstanding principal amount of the Facility B Loans, all accrued and unpaid interest thereon, and all other Facility B Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility B Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility B Loans, all accrued and unpaid fees with respect to Facility B and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility

11

B Lenders or to any Facility B Lender, the Administrative Agent or any indemnified party with respect to Facility B arising under the Loan Documents.

"Facility C" means the term loan facility described in Section 2.01(c).

"Facility C Commitment" means, for each of the Facility C Lenders as of the Closing Date, the amount of the Facility C Loan held by such Facility C Lender on the Closing Date. Notwithstanding the reference to the "Commitment" of the Facility C Lenders, the Facility C Loans were fully disbursed under the Original Credit Agreement, and no Facility C Lender has any obligation to make any advances under Facility C.

"Facility C Lender" means, at any time, each of the Lenders holding an interest in Facility C.

"Facility C Maturity Date" means October 31, 2009 or such earlier date upon which the outstanding principal amount of the Facility C Loans, all accrued and unpaid interest thereon, and all other Facility C Obligations become or are declared due and payable pursuant to the terms of this Agreement.

"Facility C Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility C Loans, all accrued and unpaid fees with respect to Facility C and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility C Lenders or to any Facility C Lender, the Administrative Agent or any indemnified party with respect to Facility C arising under the Loan Documents.

"Facility D" means the revolving credit (including letter of credit) facility described in Section 2.01(d).

"Facility D Commitment" means, for each of the Facility D Lenders, the obligation of such Facility D Lender to participate in Letters of Credit issued under Facility D, and to make loans pursuant to Facility D, not exceeding in the aggregate the amount set forth in Schedule 1 hereto as its "Facility D Commitment" or the amount set forth in any Assignment and Assumption Agreement by which such Facility D Lender acquires an interest in Facility D, as such applicable amount may be increased or decreased from time to time pursuant to the terms hereof.

"Facility D Lender" means, at any time, each of the Lenders holding an interest in Facility D.

"Facility D Loan Availability" means the amount by which the Aggregate Facility D Commitment exceeds the Aggregate Facility D Outstanding Credit Exposure.

"Facility D Maturity Date" means October 31, 2009 or such earlier date upon which the outstanding principal amount of the Facility D Loans, all accrued and unpaid interest thereon, and all other Facility D Obligations become or are declared due and payable pursuant to the terms of any of this Agreement.

"Facility D Obligations" means all unpaid principal of and accrued and unpaid interest on the Facility D Loans, all LC Disbursements, all accrued and unpaid fees with respect to Facility D and all expenses, reimbursements, indemnities and other obligations of the Credit Parties to the Facility D Lenders or to any Facility D Lender, the Administrative Agent or any indemnified party with respect to Facility D arising under the Loan Documents.

"Facility D Outstanding Credit Exposure" means, as to any Facility D Lender at any time, the sum of (i) an amount equal to its LC Exposure at such time, plus (ii) the aggregate principal amount of its Facility D Loans outstanding at such time.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, at any time, the chief financial officer, principal accounting officer, treasurer or controller of (a) the Borrower if at such time a Person holds any such position and, if not, (b) the General Manager.

"Focus" means Focus South Group, LLC, a Nevada limited-liability company.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Manager" means Holdings Manager, LLC, a Nevada limited-liability company, or any Person that shall succeed it as general manager of the Borrower in accordance with the provisions of this Agreement.

"Governmental Approval" means all right, title and interest in any existing or future certificates, licenses, permits, variances, authorizations and approvals issued with respect to the Project by any Governmental Authority having jurisdiction with respect to the Project.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

13

"Guaranties" means the Repayment Guaranties executed by each of the Members and their respective Parent Guarantors, the Completion Guaranties executed by each of the Members and their respective Parent Guarantors, and the Limited Guaranties executed by each of the Members and their respective Parent Guarantors; "Guaranty" means one of the Guaranties.

"Guarantor" means any Credit Party that executed or executes a Guaranty pursuant to the Original Credit Agreement or this Agreement and includes both the Members and the Parent Guarantors.

"Hard Costs" is defined in the definition of "Development Costs."

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental, Health or Safety Requirements or Law.

"Holders of Secured Obligations" means the holders of the Secured Obligations from time to time and shall include (i) each Lender in respect of its Loans, (ii) each Issuing Bank in respect of LC Disbursements owed to it, (iii) the Administrative Agent, the Lenders and the Issuing Banks in respect of all other present and future obligations and liabilities of any Credit Party of every type and description arising under or in connection with this Agreement or any other Loan Document, (iv) each Indemnitee in respect of the obligations and liabilities of any Credit Party to such Person hereunder or under the other Loan Documents, (v) each Lender (or Affiliate thereof), in respect of all Secured Swap Obligations of Borrower to such Lender (or Affiliate), and (vi) their respective successors, transferees and assigns.

"Improvements" means infrastructure improvements constructed and installed or to be constructed or installed on the Project, as described in the Scope of Work and more specifically provided for in the Approved Plans and Specifications.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Contingent Obligations of such Person, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest

in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" is defined in Section 11.03(b).

"Information Memorandum" means the Confidential Information Memorandum dated February 15, 2007 relating to the Borrower and the Transactions.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.08.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Issuing Bank" means JPMorgan Chase Bank, N.A. and any Facility D Lender that, at the request of the Borrower and with the approval of the Administrative Agent in its reasonable judgment, agrees to issue Letters of Credit hereunder, each in its capacity as the issuer of Letters of Credit hereunder, and any successors in such capacity as provided in Section 2.06(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by its Affiliates, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Key Member" means KB Nevada Home, Inc., Coleman-Toll Limited Partnership and any other Member that is approved as a "Key Member" by the Required Lenders.

"Key Member Acquisition" is defined in Section 9.07(c).

15

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Facility D Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Persons listed on Schedule 1 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LID Bond Account" means an account established with the LID Bond trustee or another Person pursuant to the LID Bond Documents, into which account the Net LID Proceeds shall be disbursed to or as directed by the Borrower from time to time for payment of certain Approved Development Costs in accordance with the LID Bond Documents.

"LID Bond Documents" means each indenture and other document or instrument that evidences the issuance of or is executed and delivered in connection with or that secures the LID Bonds.

"LID Bonds" means any Local Improvement District Bonds issued with respect to the Project.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

16

"Limited Guaranty" means, with respect to each Member and its Parent Guarantor, that certain Limited Guaranty dated November 1, 2004 executed and delivered by such Member and its Parent Guarantor, as supplemented by the Consent and Agreement.

"Loan Documents" means (a) this Agreement, any Notes delivered pursuant hereto or the Original Credit Agreement, the Guaranties, the Environmental Indemnity Agreement and the Collateral Documents and (b) any and all other instruments or documents delivered or to be delivered by the Credit Parties pursuant hereto or pursuant to any of the other documents described in clause (a) above.

"Loan Title Insurance Policy" means the American Land Title Association loan policy (1992 Form), issued by the Title Insurer to Administrative Agent on or about the Original Closing Date, and the related reinsurance agreements, as revised and updated (including by the endorsement provided for in Section 4.01(e)) from time to time with the Administrative Agent's consent.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Major Project Contract" means one or more Project Contracts under which the aggregate amount payable to the same Project Contractor exceeds $5,000,000.

"Major Subcontract" means one or more subcontracts for the furnishing of labor and materials under which the aggregate amount payable to the same subcontractor exceeds $5,000,000.

"Major Subcontractor" means a subcontractor under a Major Subcontract.

"Master Plan" means the West Henderson and Section 34 Land Use and Transportation Plan (CPA-02-520035).

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower, (b) the ability of the Borrower to perform any of its obligations under this Agreement or any Loan Document or (c) the rights of or benefits available to the Administrative Agent or the Lenders under this Agreement or any of the other Loan Documents. Without limitation of the foregoing, an adverse effect of $5,000,000 or more on the Borrower or the Project shall be deemed material.

"Material Default" means any Event of Default under Section 9.01(a) or (b) hereof or (with respect to the Borrower) under Section 9.01(h), (i) or (j) hereof.

"Material Indebtedness" means, at any time in the case of each Parent Guarantor, Recourse Indebtedness in an amount in excess of 5% of its total Recourse Indebtedness.

"Maturity Date" means (i) with respect to Facility A, the Facility A Maturity Date, (ii) with respect to Facility B, the Facility B Maturity Date, (iii) with respect to Facility C, the Facility C Maturity Date, and (iv) with respect to Facility D, the Facility D Maturity Date.

17