SYLVESTER & POLEDNAK, LTD.
  Jeffrey R. Sylvester, Esq. (Nevada Bar No. 4396)
      jeff@sylvesterpolednak.com
  Allyson R. Noto, Esq. (Nevada Bar No. 8286)
      allyson@sylvesterpolednak.com
7371 Prairie Falcon Road, Suite 120
Las Vegas, Nevada 89128
Tel.: (702) 952-5200
Fax: (702) 952-5205

MORRISON & FOERSTER LLP
  James E. Hough, Esq. (Admitted *pro hac vice*)
      jhough@mofo.com
1290 Avenue of the Americas
New York, New York 10104-0050
Tel.: (212) 468-8000
Fax: (212) 468-7900

Attorneys for Plaintiff JPMORGAN CHASE BANK, N.A.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A., | Case No.: 2:08-cv-01711-PMP-(RJJ) |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | |
| KB HOME and KB HOME NEVADA, INC., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |
| JPMORGAN CHASE BANK, N.A., | Case No.: 2:08-cv-01713-PMP-(RJJ) |
| Plaintiff, | |
| v. | |
| COLEMAN-TOLL LIMITED PARTNERSHIP and TOLL BROTHERS, INC., | |
| Defendants. | |

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A., | Case No.: 2:08-cv-01715-PMP-(RJJ) |
| Plaintiff, | |
| v. | |
| BEAZER HOMES HOLDING CORP. and BEAZER HOMES USA, INC., | |
| Defendants. | |
| JPMORGAN CHASE BANK, N.A., | Case No.: 2:08-cv-01716-PMP-(RJJ) |
| Plaintiff, | |
| v. | |
| PARDEE HOMES OF NEVADA and WEYERHAEUSER REAL ESTATE COMPANY, | |
| Defendants. | |
| JPMORGAN CHASE BANK, N.A., | Case No.: 2:08-cv-01717-PMP-(RJJ) |
| Plaintiff, | |
| v. | |
| MERITAGE HOMES OF NEVADA, INC. (f/k/a MTH-HOMES NEVADA, INC.) and MERITAGE HOMES CORP., | |
| Defendants. | |

Plaintiff JPMorgan Chase Bank, N.A. ("JPMorgan" or "Plaintiff"), by and through its undersigned counsel, hereby responds in opposition to the motions to dismiss filed in the above-captioned cases by defendants KB Home and KB Home Nevada, Inc.; Coleman-Toll Limited Partnership and Toll Brothers, Inc.; Beazer Homes Holding Corp. and Beazer Homes USA, Inc.; Pardee Homes of Nevada and Weyerhaeuser Real Estate Company; and Meritage Homes of Nevada, Inc. and Meritage Homes Corporation (collectively, the "Moving Defendants").[1]

---

[1]   The Moving Defendants filed identical motions in the following five actions: (1) JPMorgan Chase Bank, N.A. v. KB Home, No. 08 Civ. 1711; (2) JPMorgan Chase Bank, N.A. v. Coleman-Toll Limited Partnership, No. 08 Civ. 1713; (3) JPMorgan Chase Bank, N.A. v. Beazer Homes Holdings Corp., No. 08 Civ.
(continued on next page)

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  This opposition is made and based upon the points and authorities attached hereto, the

2  declaration of James E. Hough dated March 19, 2009 ("Hough Decl."), all of the pleadings and

3  papers on file herein, and any argument of counsel at the time of the hearing of the matter.

4

5  Dated:  March 19, 2009                         SYLVESTER & POLEDNAK, LTD.

6
                                          By:  ___/S/ Jeffrey R. Sylvester_____
7                                               Jeffrey R. Sylvester
                                               7371 Prairie Falcon Road, Suite 120
8                                               Las Vegas, Nevada 89128
                                               Tel.: (702) 952-5200
9                                               Fax: (702) 952-5205
                                               jeff@sylvesterpolednak.com
10
                                               James E. Hough (admitted *pro hac vice*)
11                                              MORRISON & FOERSTER LLP
                                               1290 Avenue of the Americas
12                                              New York, New York 10104-0050
                                               Tel.: (212) 468-8000
13                                              Fax: (212) 468-7900
                                               jhough@mofo.com
14
                                               *Attorneys for Plaintiff JPMorgan Chase*
15                                              *Bank, N.A.*

16

17

18

19

20

21

22

23

24

25

26  (continued from previous page)

27  1715; (4) JPMorgan Chase Bank, N.A. v. Pardee Homes of Nevada, No. 08 Civ. 1716: and (5) JPMorgan Chase Bank, N.A. v. Meritage Homes of Nevada, Inc. No. 08 Civ. 1717.

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       The Moving Defendants ask this Court to hold, as a matter of law, that despite defendants'
4   defaults on agreements they signed in order to obtain up to $585 million in financing for one of Las
5   Vegas' most ambitious developments, the secured creditors on whose behalf this lawsuit is brought
6   have no recourse.  Such an unprecedented ruling is unjustified, and not supported by the case law
7   cited by the Moving Defendants.

8       This case involves the Las Vegas area's largest master planned community, "Inspirada," to be
9   built according to "new urbanism" principles, spread out over nearly two thousand acres in
10  Henderson, and projected to cost at least $1.55 billion to build.  The complaints[2] were filed by
11  JPMorgan as Administrative Agent for a syndicate of banks (the "Lenders"), and they describe
12  complex contractual and legal relationships that inextricably link the Moving Defendants with the
13  Plaintiff, and provide the necessary grounds for Plaintiff to recover on the asserted claims.

14      Plaintiff has more than adequately met the liberal notice pleading standards of Rule 8 of the
15  Federal Rules of Civil Procedure, and, on that basis alone, the Moving Defendants' motions must be
16  denied.  Only after discovery, and a review on the merits, can the fact-based arguments raised by the
17  Moving Defendants be adjudicated.

18      Moving Defendants' motions fail because they ignore the basis on which Plaintiff asserts
19  claims against them and the applicable law.  The borrower, South Edge LLC, which was formed by
20  Moving Defendants for the sole purpose of developing Inspirada, could not repay the massive loan it
21  obtained from the Plaintiff and the Lenders, unless Moving Defendants fulfilled their contractual and
22  other obligations to the borrower.  As security for the Lenders' loan, the borrower was required,
23  among other things, to assign rights and claims under various agreements with Moving Defendants so
24  that the Lenders would have recourse against each of the defendants, instead of recourse only against
25  the borrower.  As a result, Plaintiff has standing to assert the claims alleged in the complaints not as a

26      [2] In addition to the five actions involving the Moving Defendants, Plaintiff filed two additional
27  complaints currently before this Court: JPMorgan v. Focus South Group LLC., Case No. 08 Civ. 1709 and
    JPMorgan v. Alameda Investments, LLC, Case No. 08 Civ. 1714.

28

4

1  supposed "third party beneficiary," but as the direct holder and assignee of the asserted claims, which

2  Moving Defendants generally concede are otherwise well pled.   At a minimum, as the Moving

3  Defendants themselves concede and in contradiction to their moving papers in this case, Plaintiff has

4  stated a claim for breach of contract. See Hough Decl. Ex. D (Moving Defendants' Reply Brief filed

5  in New York federal court) at 6 ("[e]ven if the [Nevada] motions [to dismiss] were granted in full,

6  JPMorgan would still have a claim for breach of the Acquisition Agreement (at least on the basis of

7  the pleadings alone").

8  **II.   SUMMARY OF ALLEGATIONS[3]**

9      **A.   "Inspirada"**

10      In 2003 a consortium of developers and homebuilders began preliminary talks for the creation

11  of a massive "new urbanism" development in Henderson, Nevada, to be known as "Inspirada," which

12  was to include approximately 11,500 residences, shopping areas, trails, parks, cultural centers, and

13  other amenities.  (¶ 14.)  The Inspirada project (or, the "Project") was intended to be significant in

14  scope, with total costs originally budgeted at approximately $1.25 billion.[4]  (¶ 10.)  The Project was

15  of such a large scale that even the largest homebuilders in the country could not (and would not)

16  undertake it on their own.   Therefore, the developers and homebuilders created a single purpose

17  limited liability company, South Edge, LLC ("South Edge"),[5] to allocate responsibilities among each

18  developer and to seek funding for the Project.  (¶¶ 7, 15.)  South Edge is a Nevada limited liability

19  company and operates pursuant to an operating agreement (the "LLC Agreement").  (Ex. B.)

20      After much negotiation, the Lenders agreed to finance a significant portion of the costs of the

21  Project.  (¶ 15.)  To that end, South Edge and the Lenders entered into a credit agreement, dated

22      [3]   References to "¶ ___ " are to paragraphs of the complaints filed against the Moving Defendants on
23  December 5, 2008; "Ex. ___" are to exhibits of the appendix filed with the complaints and incorporated by
reference therein. The Moving Defendants submitted identical memoranda of points and authorities which
24  have slightly different pagination due to text formatting differences. For ease of reference, citations to "Defs.
Br. at ___" are to pages of the Memorandum of Points of Authorities filed in case number 08 Civ. 1711
25  (Docket No. 27) by defendants KB Home and KB Home Nevada.

    [4] That budget has increased to more than $1.55 billion due to cost overruns and delays, among other
26  things. (¶¶ 10, 14.)

27      [5] South Edge is made up of eight Members, all of which are subsidiaries of some of the largest
homebuilders and developers in the country (the "Parents"). (¶ 8.)

28

1  November 1, 2004, which was replaced by an Amended and Restated Credit Agreement, dated March
2  9, 2007 (the "Credit Agreement"), pursuant to which the Lenders committed to lend up to
3  approximately $585 million to South Edge. (¶ 15; Ex. A.)  JPMorgan, as administrative agent under
4  the Credit Agreement, coordinates and facilitates the loans, and brings these actions on behalf of the
5  Lenders.  (¶ 4.)

6          **B.     South Edge and the Credit Agreement**

7          The defendants named in the complaints include certain members of South Edge.   The
8  members of South Edge, including those named in the complaints, are the subsidiaries of eight of the
9  largest homebuilders and developers in the country ("Members").  (¶ 8.)  South Edge was set up so
10  that obligations to the Lenders would be made through South Edge by each of the Members.  In the
11  LLC Agreement, the Members set out various obligations owing to each other and to South Edge.
12  (Ex. B.)  This is not a run-of-the-mill operating agreement or governance document, but rather it is a
13  complex, hybrid agreement addressing not only governance of South Edge, but also involving many
14  purchase and sale and development obligations.  Although the LLC Agreement predates the Credit
15  Agreement, it contemplates the general structure of the loan arrangement as finally agreed to in the
16  Credit Agreement.  (Ex. B at § 2.3.3.)  South Edge's payments to the Lenders under the Credit
17  Agreement, therefore, mirror the Members' obligations in the LLC Agreement and their obligations
18  under their respective Acquisition Agreements, which are also assigned to Lenders, as discussed
19  infra.[6]  Indeed, the LLC Agreement was amended to incorporate the substantial obligations outlined
20  in the Acquisition Agreements and assigned to Lenders with the consent of all parties pursuant to the
21  Credit Agreement.  See Ex. B (First Amendment to the Amended and Restated Operating Agreement
22  [LLC Agreement]) dated October 29, 2004).

23          Under the terms of the Credit Agreement and related Loan Documents (defined at ¶ 15), the
24  Lenders agreed to loan South Edge a large sum to be used to purchase the land and fund development
25  of the Project.  (Id.)  As part of the plan for Inspirada (and specifically reflected in the Credit

26          [6] Every Member has its own Acquisition Agreement with South Edge, but each Acquisition Agreement is
27  substantially identical.  Plaintiff refers to the "Acquisition Agreements" (in the plural) simply to reflect the
   collective existence of all the agreements.

28

1    Agreement and related Loan Documents), each Member agreed to purchase from South Edge specific
2    parcels of land it was going to develop (such parcels were also designated in the Credit Agreement),
3    and the purchase payments for such parcels were scheduled to coincide with South Edge's principal
4    repayments under the Credit Agreement. (¶¶ 16-17; compare Ex. A § 7.03(b) and Schedule 2 with
5    Ex. B §§ 2.3.3, 2.3.4)  These Member purchases—known as "take-downs"—are divided into phases.
6    (¶ 17.)

7           The Credit Agreement requires that each time a Member acquires (or "takes-down") a phase,
8    South Edge must pay the Lenders an amount equal to the purchase price paid by the Member to
9    South Edge for that take-down.  The Members are obligated under both the integrated and cross-
10   referenced LLC Agreement and the Acquisition Agreements to make the "take-down" payments to
11   South Edge.  (Ex. B at § 2.3.3; Ex. C § 1.b and "Take Down Schedule" attached as "Exhibit C"
12   thereto; Ex. B (First Amendment to the LLC Agreement) § 2(h).)

13          While the LLC Agreement speaks generally of the take-down obligations, the Acquisition
14   Agreements lay out in greater detail what payments the Members are required to make to South Edge
15   and the "take-down" schedule for the parcels of land that they are obligated to purchase and develop.
16   The prescribed schedule was designed to coincide precisely with payments owed by South Edge to
17   the Lenders under the Credit Agreement.  Both the Acquisition Agreement and the LLC Agreement
18   provide the necessary mechanism for South Edge to satisfy its payment obligations to the Lenders,
19   and South Edge's rights to enforce those contracts are part of the Lenders' collateral.

20          C.      The Lenders' Rights

21          The Lenders were only willing to make this substantial loan if they were adequately secured.
22   As security for the loan underlying Inspirada, the Lenders required—and obtained—both a lien on the
23   land and on South Edge's rights vis-à-vis the Members and their Parents.

24          In any loan—especially one of this size to an entity with virtually no assets aside from the
25   bare land—the Lenders seek assurance of payment under the loan, as well as protections in the event
26   that payments are not made.  Here, the protection sought—and received—by the Lenders was based
27   in significant part on the underlying agreements between and among the Members.  Because South
28   Edge was formed solely to create Inspirada, the Lenders needed assurances—in addition to South

7

1   Edge's mere promise to pay and a lien on the undeveloped land—that they could seek payment from
2   the true parties in interest, that is, the Members and their Parents, if South Edge defaulted.   If
3   Members defaulted on their obligations to pay South Edge, then South Edge would be doomed to
4   default on its obligations to the Lenders.

5         The Lenders' security was expressly provided for in the Credit Agreement and related Loan
6   Documents:  South Edge assigned and pledged all its rights and claims under all agreements that it
7   had with the Members and Parents to the Lenders, so that the Lenders would have recourse against
8   each of the Members and their Parents, instead of recourse only against South Edge.  (¶¶ 25-26.)
9   Pursuant to the Credit Agreement, South Edge executed, in favor of the Lenders, various "Collateral
10  Documents."   The Collateral Documents include the Deed of Trust, through which the LLC
11  Agreement and other contract claims were also pledged as collateral, the Assignment of Acquisition
12  Agreements, and the Assignment of Contracts.  (Ex. A, § 1.01 "Collateral Documents.")

13        Under the Assignment of Acquisition Agreement, the Deed of Trust, and the Credit
14  Agreement, South Edge assigned all of its rights under all of its agreements with each Member and
15  Parent to Lenders as collateral for the $585 million loan.[7]  Each of the Members and Parents also
16  expressly consented to each of the Loan Documents in the Consent and Agreement.  (Hough Decl.
17  Ex. C.)

18            1.     Credit Agreement

19        In the Credit Agreement, South Edge explicitly appointed JPMorgan for the Lenders its
20  "lawful attorney in fact with full power of substitution" and stated that Plaintiff, for the Lenders,
21  could "do any and every act which the Borrower might do in its own behalf."  (Ex. A at Section
22  9.03.)

23            2.     Assignment of Acquisition Agreements

24        In the Assignment of Acquisition Agreements, South Edge granted Lenders the right to force
25  each Member to make its take-downs as required under the Acquisition Agreements, as well as

26  _____

27     [7]   The Deed of Trust also provided for various other forms of security, such as a lien on the land
    underlying Inspirada.

28

1 require them to make any other payments owing to South Edge. (¶ 30.)  The Assignment of

2 Acquisition Agreements provides this assurance because the Members controlled South Edge and the

3 Lenders needed assurance that the Members and their Parents would not use South Edge as a shield

4 between them and Lenders.  Paragraph 4 of the Assignment of Acquisition Agreements further

5 provided that "each of the Member[s] [] consents to the assignment of Acquisition Agreements

6 hereunder and agrees, subject to the terms of this Agreement, that its rights . . . arising out of [] or

7 relating to the Acquisition Agreements shall be and hereby are intentionally, irrevocably, and

8 unconditionally subject and subordinate to all rights, interests, security interests and liens in favor of

9 [Lenders] under the other Loan Documents." (emphasis added.)

10                 **3.**     Deed of Trust

11        The Deed of Trust granted Lenders all of the "contract rights" (and the enforcement of them)

12 that it had against the Members and Parents.  This means that Lenders can step into the shoes of

13 South Edge to enforce the Members and Parents' obligations related to the Project.  Under the Deed

14 of Trust, the assignment of South Edge's rights under the LLC Agreement, the Acquisition

15 Agreement, and any and all other "contract rights" and "actions and rights in action" including those

16 involving the Members, were explicitly assigned as collateral for Lenders' loan.  (Ex. D at 4.)

17 Because of this assignment of collateral, Lenders have the right to enforce South Edge's rights

18 against each of the Members and Parents under any contracts to which they are a party or from which

19 South Edge's rights may arise, including the right to seek payment due for acquisition of land,

20 payment of fees, capital calls, and all other contractual obligations.  (¶ 29.)  Among these assigned

21 contract rights are rights to payments under the Acquisition Agreements (¶¶ 25(c), 26, 30, Ex. F § 2),

22 as well as the rights of South Edge under the LLC Agreement (¶¶ 25(a), 26, 29, Ex. D at 4).  Among

23 these rights are the rights to demand, receive, and enforce capital calls, as well as general contractual

24 rights such as breaches of the duty of good faith and fair dealing and other fiduciary duties.  Thus,

25 regardless of whether South Edge is unable or unwilling to enforce and collect Defendants'

26 payments, Lenders are entitled under the Collateral Documents to do so.

27 ///

28 ///

### D.   Members' Failure To Pay And South Edge's Default

South Edge is currently in default under the Credit Agreement and other loan documents for, among other reasons, its failure to timely pay interest and fees accruing under the Credit Agreement, and to make principal payments as and when due. (¶ 33.)  These Events of Default flow directly from the Members' failure to make take-down payments owing to South Edge as and when due. (¶ 35.)  Further, various payments (other than take-down payments) are due and owing to South Edge as management fees, interest, taxes, and other fees associated with the Project.  (¶ 37.)  Beyond the defendants' failure to make payments as required, they have also steadfastly refused to give assurances that they will make any payments in the future. (¶ 40.)

The Members, all subsidiaries of their Parents, are alleged to be controlled and directed in their actions by their Parents.  (¶¶ 11, 47.)  To that end, the breaches of the LLC Agreement and the Acquisition Agreements were caused by the Parents, because it was the Parents directing the actions (and inactions) of the Members in failing to take-down their parcels and otherwise interfering with and blocking performance of obligations owing to the Lenders.  The Members and Parents each violated their duty to act in the best interests of South Edge and to subordinate their own rights to the Lenders' rights and collateral, as noted above.  (Ex. F § 4.)  South Edge relies on the Members and their Parents for timely payment of its obligations under the Credit Agreement and related Loan Documents.  Thus, the breaches by the Members and Parents of their agreements with South Edge have, in turn injured Plaintiff and the Lenders.

### III.   APPLICABLE STANDARD OF REVIEW

The Moving Defendants conspicuously avoid any discussion of the applicable standard on a motion to dismiss pursuant to Rule 12(b)(6), which may be granted only in extraordinary circumstances. United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).  Indeed, "[t]here is a strong presumption against dismissing an action for failure to state a claim." Montgomery v. Etrepid Techs. LLC, No. 06 Civ. 0056 (PMP), 2008 U.S. Dist. LEXIS 28118, at * 7 (D. Nev. Apr. 7, 2008) (citing Ileto v. Glock Inc., 349 F.3d 1191, 1200 (9th Cir. 2003)).  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v.

10

1    Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081, 1085 (2007) (per curiam) (citing Bell Atl. Corp.

2    v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929, 940 (2007) (quoting Conley v. Gibson, 355

3    U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).   The Moving Defendants bear the burden of

4    showing that Rule 8(a)(2) has not been met.   Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,

5    1409 (3rd Cir. 1991).   Thus, dismissal is inappropriate, unless the moving party can show that the

6    complaint does not give the defendant fair notice of a legally cognizable claim.   Ernestberg v.

7    Mortgage Investors Group, No. 08 Civ. 1304 (RCJ), 2009 U.S. Dist. LEXIS 4560, at * 8 (D. Nev.

8    Jan. 22, 2009) (citing Bell Atl., 127 S. Ct. at 1964) (denying motion to dismiss complaint).   The issue

9    is not whether Plaintiff will prevail, but whether Plaintiff is entitled to offer evidence to support its

10   claims.   Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).   On a motion to dismiss, "'[a]ll allegations and

11   reasonable inferences are taken as true, and the allegations are construed in the light most favorable

12   to the non-moving party, but conclusory allegations of law and unwarranted inferences are

13   insufficient to defeat a motion to dismiss.'"   George v. Morton, No. 06 Civ. 1112 (PMP), 2007 U.S.

14   Dist. LEXIS 15981, at *17 (D. Nev. Mar. 1, 2007) (internal citations omitted).

15          Finally, when, as here, material is submitted as part of the complaint, it may be considered by

16   the court without converting the motion to dismiss into a motion for summary judgment.   Hal Roach

17   Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) ("material which is

18   properly submitted as part of the complaint may be considered" on a motion to dismiss); United

19   States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) ("[a] court may, however, consider certain

20   materials -- documents attached to the complaint, documents incorporated by reference in the

21   complaint, or matters of judicial notice -- without converting the motion to dismiss into a motion for

22   summary judgment.").

23   **IV.   ARGUMENT**

24          The Moving Defendants' central and flawed argument is that Plaintiff does not have standing

25   to assert the claims that, for the most part, the Moving Defendants concede are otherwise well pled.

26   To the contrary, Plaintiff has adequately alleged the basis of its rights as a secured creditor under

27   UCC § 9-607 (N.R.S. § 104.9607), and is not suing as a mere third-party beneficiary of the LLC

28   Agreement or Acquisition Agreements. (¶¶ 25-31.)

11

1

### A.   Plaintiff Has Alleged A Sufficient Basis To Enforce The Claims

2    Moving Defendants' central argument, as to each claim, rests on a challenge to Plaintiff's
3    standing to assert South Edge's rights and claims as Lenders' collateral. (Defs. Br. at Part III.A1-A3)
4    (which arguments are incorporated at 9, regarding Count II; 10, regarding Count III; 14, regarding
5    Count IV; and 19, regarding Count V).  These arguments fail to provide any basis to dismiss the
6    complaints.  As alleged in the complaints, Plaintiff has standing to assert the claims as a result of the
7    pledged collateral (¶¶ 25-26) and the authority granted to Plaintiff to enforce its security (¶¶ 27-31).
8    See UCC § 9-607 (N.R.S. § 104.9607).  The Moving Defendants are unable to challenge the
9    sufficiency of the allegations, and, instead, attempt to challenge the validity of the agreements.  These
10   factual arguments should not be considered on a motion to dismiss.  See, e.g., Oracle Corp. v.
11   SAP AG, No. 07 Civ. 1658 (PJH), 2008 U.S. Dist. LEXIS 103300, at *16–21 (N.D. Cal. Dec. 15,
12   2008) (parties' opposing theories whether defendants were actually parties to the alleged contracts
13   were "disputed factual issues" and, therefore, not appropriate for resolution on a Rule 12(b)(6)
14   motion).  Even if the allegations can be read to support either party's position, the "[d]efendant has
15   not met its heavy burden of showing that plaintiff can prove no facts in support of its claims that
16   would entitle it to relief," and the motion to dismiss must be denied.  Four Seasons Hotel Las Vegas
17   v. Get-a-Way Travel, Inc., No. 06 Civ. 0077 (KJD), 2006 U.S. Dist. LEXIS 45893, at *10 (D. Nev.
18   July 5, 2006) (defendant's motion to dismiss denied).  Moreover, this argument is so weak that the
19   Moving Defendants themselves openly repudiated it before the United States District Court in New
20   York, where they explicitly concede that "[e]ven if the [Nevada] motions [to dismiss] were granted in
21   full, JPMorgan would still have a claim for breach of the Acquisition Agreement (at least on the basis
22   of the pleadings alone)."  (Hough Decl. Ex. D at 6.)

23                    ### 1.   Plaintiff Is Suing As A Secured Creditor, Not A Third-Party Beneficiary
24   Contrary to Moving Defendants' argument, (Defs. Br. at 6 & n.1 (Part III.A1)), Section 15.15
25   of the LLC Agreement does not bar secured creditors from exercising rights assigned to them under
26   / / /
27   / / /
28   / / /

1    the contract. That section addresses only putative third-party beneficiaries.[8]  Ex. B at Section 15.15

2    ("CREDITORS: None of the provisions of this Agreement shall be for the benefit of or enforceable by

3    any creditors of the Company, any Manager or any Member."). This only makes sense: Inspirada

4    required the joint efforts of eight home builders whose relationship with one another was defined by

5    the terms of the LLC Agreement. This organizing structure implicates common place third-party

6    beneficiary issues because each Member, in meeting its obligations, would necessarily contract with

7    third parties for the benefit of the project. In a project of this massive size and involving so many

8    independent home builders, it stands to reason that the Members would ensure that any individual

9    Member's disputes with third-parties would not interfere with South Edge, hence the need for Section

10   15.15. Nowhere, however, does Section 15.15 speak of a secured creditor of South Edge asserting

11   claims that have been assigned to it. Each Member not only consented to the Loan Documents in

12   which Lenders were granted these rights, but in no case did those later signed documents explicitly

13   carve out the LLC Agreements from the broad grant of collateral to Plaintiff.[9]

14          Moreover, this boilerplate limitation must be reconciled with the specific rights that were

15   assigned to Plaintiff through the Collateral Documents and in which Plaintiff was granted a secured

16   interest. "'[G]eneral, boilerplate language' prohibiting third party actions 'must yield to the specific

17   direction' of separate contractual provisions granting third parties enforceable rights in assumed

18   liabilities." In re Stone & Webster, Inc., Nos. 05 Civ. 2717 & 07 Civ. 1772, 2009 U.S. App. LEXIS

19   3689, at *17 (3rd Cir. Feb. 24, 2009) (affirming lower court's rejection of defendants' "standing"

20   objection to plaintiff's claims based on third-party beneficiary clause in one agreement because it

21   could not be reconciled with the rights granted to plaintiff in other, related agreements). This is

22   especially true where the earlier prohibition is followed by a later grant of collateral to the Lenders, to

23   which defendants consented. Compare Ex. B (LLC Agreement dated May 3, 2004) with Exhs. C, D,

24

25          [8]    None of the other provisions the Moving Defendants reference (namely, Sections 2.3.1, 2.3.3, 2.3.8,
     and 11.1) even mentions creditors, much less supports any argument that Plaintiff is barred from asserting any
26   claims.

27          [9]    Apparently, the Moving Defendants want to reform the broad grant of collateral to create a carve out
     for the LLC Agreement, but that wrongful maneuver cannot be accomplished in this motion to dismiss.

28

and F (dated October 29 and November 1, 2004). Examined in the context of the complex agreements relating to Inspirada, it would be unreasonable to read an earlier boilerplate clause such as Section 15.15 to preclude Plaintiff's exercise of rights that were later specifically granted in the Collateral Documents. Turner v. United States, 875 F. Supp. 1430, 1434 (D. Nev. 1995) ("the Court must give preference to reasonable interpretations as opposed to those that are unreasonable").[10]

As an express condition of entering the Credit Agreement, South Edge assigned all of its rights and claims under all of its agreements with each Member and Parent to Lenders as collateral for the $585 million loan, so that the Lenders would have recourse against each of the Members and their Parents instead of recourse only against South Edge.  (¶¶ 25-26, describing the pledged collateral.)  These documents provide Plaintiff with the ability to enforce the rights of all the underlying contracts described therein.[11]  Thus, rights and claims and obligations outlined in the Acquisition Agreements (Ex. C)—which concern the Moving Defendants' contributions and take-down obligations to South Edge—were pledged to Plaintiff through the Assignment of the Acquisition Agreements. (Ex. E at Article 2.)  And South Edge's rights under the LLC Agreement

---

[10]   The Moving Defendants argue in a footnote (Defs. Br. at 6 n.2) that even if Section 15.15 does not preclude Plaintiff's action, Plaintiff's interest must be subordinated to any defenses available to South Edge. They are wrong. The Moving Defendants "subordinated their respective rights, claims and interests as to Borrower in favor of Plaintiff's and other Lenders' rights, claims and interests pursuant to § 4 of the Assignment of Acquisition Agreements." (¶ 31.)  See Ex. F (Assignment of Acquisition Agreements) at § 4 (noting that the subordination was made "intentionally, irrevocably and unconditionally").   The LLC Agreement incorporates the obligations from the Acquisition Agreements—which obligations were, pursuant to Article 4, subordinated to Plaintiff's secured rights.  See Ex. B at "First Amendment to Amended And Restated Operating Agreement" [LLC Agreement] at § 1 (referencing purposes of amendment to bring LLC Agreement in conformity with the requirements of the Credit Agreement); and §§ 2(h)(j) (incorporating into the LLC Agreement the rights and obligations of the Acquisition Agreements as assigned and subordinated to Plaintiff). (See also Hough Decl. Ex. C (Consent & Agreement).)  The Consent & Agreement was signed by each defendant to ratify each of the Loan Documents.

[11]   The Moving Defendants argue that the security interest in the LLC Agreement is invalid because the LLC Agreement was not referenced specifically by name. (Defs. Br. at 6–7 (Part I.B).)  This argument has no merit. The description of the security pledged ("all contracts, accounts, general intangibles") is sufficient to meet the requirements of the applicable statute, which states, under the subheading "sufficiency of descriptions," that "a description of collateral reasonably identifies the collateral if it identifies the collateral by (b) Category [or] (c) a type of collateral defined in the Uniform Commercial Code." N.R.S. § 104.9108. Defendants' monetary obligations under the LLC Agreement clearly fall under "contract rights." They could equally fall within the terms of "accounts" or "general intangibles" as well, as those terms are defined in the UCC.  N.R.S. § 104.9102(1)(b) defining "account" as "a right to payment of a monetary obligation"; (pp) defining "general intangible" as personal property, including payment intangibles.

1   were pledged as described in the Deed of Trust.  (Ex. D (Deed of Trust) at 4.)  Specifically, Plaintiff

2   was granted a security interest in "all" of South Edge's "contract rights, accounts, general intangibles,

3   actions and rights in action relating to the Real Property or the Personal Property. . . ." (Ex. D at 4)

4   (emphasis added).  Moving Defendants' argument that Plaintiff is precluded from asserting South

5   Edge's contractual or other claims by virtue of Section 15.15 simply ignores the explicit provisions of

6   the other, later agreements that unmistakably confer the rights asserted in this action.

7
8
        2.      **Section 15.15 Cannot Be Construed To Bar Assertion Of A Secured Creditor's Claims**

9   Moving Defendants' interpretation of Section 15.15 is incorrect, but even if it were correct, it

10  could not be given effect, as it directly conflicts with the provisions of the Uniform Commercial Code

11  ("UCC"), which renders ineffective any term of any agreement that would prohibit South Edge from

12  assigning rights to payment as collateral and enforcing its rights as a secured creditor. See N.R.S.

13  §§ 104.9406(4), 104.9408(1), and 104.9607.  The statutory scheme of the UCC provides that the

14  Members (as both "assignors" and "account debtors") and South Edge (as "debtor") cannot contract

15  as between themselves (i.e., through the LLC Agreement) to limit the creation, assignment or

16  enforcement of the rights a secured creditor (Plaintiff) has been assigned and granted as a security

17  interest. See, e.g., Chorney v. Peachtree Settlement Funding, LLC, 277 B.R. 477 (W.D.N.Y. 2002)

18  (provision in contract between debtor and account debtor prohibiting assignment was ineffective

19  under UCC as against lender to whom right was assigned by debtor in exchange for loan); In Re Nick

20  John Van Tol, 255 B.R. 57 (10th Cir. 2000) (provision in by-laws of dairy cooperative prohibiting

21  individual dairy farmers from assigning milk proceeds was ineffective under UCC as against lenders

22  to an individual farmer who had promised those proceeds in exchange for loan); Kent Meters, Inc. v.

23  EMCOL of Ill., 768 F. Supp. 242 (N.D. Ill. 1991) (contract provision between account debtor and

24  assignor prohibiting assignment of accounts receivable was ineffective under UCC as to assignee).

25  Thus, Section 9-406(4) of the UCC clearly states that "a term in an agreement between an

26  account debtor and an assignor . . . is ineffective to the extent that it:  (a) Prohibits, [or] restricts . . .

27  the assignment or transfer of, or the creation, attachment, perfection or enforcement of a security

28  interest in, the account, chattel paper, payment intangible or promissory note  . . . ."

1    N.R.S. § 104.9406(4) (emphasis added). Section 9-408(1) provides a similar provision relating to

2    agreements as between account debtors and debtors, stating that ". . . a term in . . . an agreement

3    between an account debtor and a debtor which relates to . . . a general intangible, including a contract,

4    . . .and prohibits, [or] restricts . . . the assignment or transfer of, or creation, attachment, or perfection

5    of a security interest in, the . . . general intangible, is ineffective to the extent that the term: (a)

6    Would impair the creation, attachment or perfection of a security interest. . . ." N.R.S. § 104.9408(1).

7    Finally, Section 9-607 allows Plaintiff to enforce the rights assigned to it as security on the basis that

8    ". . . in any event after default, a secured party: (a) May notify an account debtor or other person

9    obligated on collateral to make payment or otherwise render performance to or for the benefit of the

10   secured party; (b) May take any proceeds to which the secured party is entitled under N.R.S.

11   § 104.9315; (c) May enforce the obligations of an account debtor or other person obligated on

12   collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or

13   other person obligated on collateral to make payment or otherwise render performance to the debtor,

14   and with respect to any property that secures the obligations of the account debtor or other person

15   obligated on the collateral . . . ." N.R.S. § 104.9607. The Moving Defendants cannot urge an

16   interpretation of the LLC Agreement that would contravene these provisions of the UCC. "[A]

17   contract should be construed, if logically and legally permissible, so as to effectuate valid contractual

18   relations, rather than in a manner which would render the agreement invalid, or render performance

19   impossible." Mohr Park Manor, Inc. v. Mohr, 83 Nev. 107, 112, 424 P.2d 101, 104-05 (1967) ("An

20   interpretation which makes the contract or agreement lawful will be preferred over one which would

21   make it unlawful") (citing 4 Williston, Contracts § 620 (3d Ed. 1961)).[12]

22           As discussed above, Plaintiff has alleged a sufficient basis for its ability to enforce the

23   collateral consisting of these rights to payment owing to borrower. The Moving Defendants have not

24   carried their heavy burden to show that Plaintiff's claims fail to state a valid claim. As alleged, the

25   Moving Defendants pledged collateral to the Plaintiff, including South Edge's rights and interest in

26   _____

      [12]   This language is substantially the same as set forth in the Restatement 2d Contracts §203(a) ("an
27   interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an
      interpretation which leaves a part unreasonable, unlawful, or of no effect").

28

the LLC Agreement and the Acquisition Agreements.  As Plaintiff will prove, those rights were pledged with the further condition that the Moving Defendants' interests and rights were subject to and subordinate to Plaintiff's. The Moving Defendants' objections fail to challenge the sufficiency of the pleadings, and, instead, allege defenses that can only be resolved through discovery and a determination on the merits.

### B.  Plaintiff Adequately Alleges Breach Of Contract Against Each Defendant Member

The Moving Defendants also urge dismissal of Count I on the basis that Plaintiff failed to allege the existence of a contract. (Defs. Br. at 5.) This argument is a meritless attempt to require more specificity than Rule 8 requires. Rule 8 "does not impose heightened pleading standards when alleging a breach of contract." Chaganti v. I2 Phone Int'l Inc., No. 04 Civ. 987 (VRW), 2005 U.S. Dist. LEXIS 46449, at *8-9 (N.D. Cal. Mar. 10, 2005) (denying motion to dismiss breach of contract claim, noting that "[t]he purpose of the complaint is to give defendants notice of the causes of action against them. It is not to determine whether there is any genuine issue of material fact."). Rule 8 may require that a plaintiff provide a map, but it does not compel detailed driving directions. Lion Raisins, Inc. v. Connecticut Indemnity Co., No. 03 Civ. 6744 (DLB), 2006 U.S. Dist. LEXIS 11155, at *15-19 (E.D. Cal. Mar. 2, 2006) (holding that plaintiff's incorporation by reference of allegations into the first allegation of the breach of contract claim satisfied Rule 8, which does not require plaintiff to place provisions of contract more squarely at issue).

Plaintiff identified the contracts alleged to have been breached and attached and incorporated them by reference in the complaints. See ¶¶ 25-26 and Exhs. A–F. Specifically, Plaintiff alleges the existence of: the Credit Agreement, the LLC Agreement, the Loan Documents (defined at ¶ 15), and the Collateral Documents (¶ 25). Plaintiff's allegations are more than sufficient. Chaganti, 2005

///

///

///

///

///

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    U.S. Dist. LEXIS 46449 at *9 (argument that plaintiff failed to allege existence of contract was

2    simply disguised attempt to allege contract was not valid and, therefore, inappropriate to decide on a

3    motion to dismiss).[13]

4        **C.    Plaintiff Adequately Alleges Each Member's Parent Breached Its Implied**

5            **Covenant Of Good Faith And Fair Dealing**

6        The Moving Defendants challenge Count II on three bases, none of which supports dismissal

7    of this claim. (Defs. Br. at 9-11.) First, Moving Defendants repeat their previous, incorrect argument

8    that Plaintiff cannot assert an action because it is not in privity with any defendant. (Defs. Br. at 9.)

9    This argument fails for the same reasons discussed above. (Supra Part IV.A.) Because all of South

10   Edge's claims were pledged as security, Plaintiff is entitled to execute on this collateral as well.

11       Second, the Moving Defendants argue the claims fail because no Parent is party to any

12   contract. This argument is belied by the contracts Plaintiff attached to the complaints, clearly

13   indicating each Parent's signature. (Ex. C (Acquisition Agreement) at 33.) As the existence of

14   contracts has been alleged, it is inappropriate to dismiss the claim on the basis that no valid contract

15   exists. Chaganti, 2005 U.S. Dist. LEXIS 46449 at *9 ("Plaintiff has alleged the existence of a

16   contract. If defendants believe there was no valid contract, summary judgment or trial will provide

17   an appropriate forum to make that determination."); Artist Housing Holdings, Inc. v. Davi Skin, Inc.,

18   No. 06 Civ. 0893 (RLH), 2006 U.S. Dist. LEXIS 90514 (D. Nev. Dec. 14, 2006) (rejecting

19   defendants' claim that they were not a party to the contracts because plaintiff alleged they were

20   signatories and because "the trier of fact could find [they] were parties to the Agreement").

21       [13]   In all other respects, Plaintiff adequately alleges a claim for breach of contract under Nevada law to
22   satisfy the pleading rules of Rule 8:  namely (1) the existence of a contract (Exhs. A – F of the Appendix);
     (2) plaintiff's performance (¶ 15 and Ex. A) and defendants' breaches (as alleged in the notices of events of
23   default attached as exhibits G & H, and in the complaints (¶ 12, noting defendants' failure to make payments
     to South Edge; ¶ 13, noting failure to honor contractual obligations; ¶ 19, failed and refused "to purchase land
24   from Borrower in accordance with its agreements, and make other payments and perform other obligations to
     Borrower as required by its agreements"; ¶ 22, noting "defendants' failure to act"; ¶¶ 32-40, and noting
25   breaches to pay pursuant to obligations previously described at ¶ 12, noting required payments; obligation to
     purchase, ¶ 17, acquisition obligations, ¶ 18, periodic payments); and (3) damages (¶¶ 41, 44, Exhs. G & H).
26   Saini v. Int'l Game Technology, 434 F. Supp. 2d 913, 919-920 (D. Nev. 2006) ("Nevada law requires the
     plaintiff in a breach of contract action to show (1) the existence of a valid contract, (2) a breach by the
27   defendant, and (3) damage as a result of the breach.") (citing Richardson v. Jones, 1 Nev. 405, 405 (Nev.
     1865)).

28

1        Third, the Moving Defendants' contend that they did not misuse management control, and,
2  thus, they cannot be found to have acted in bad faith. (Defs. Br. at 10.) This contention should be
3  rejected because it ignores the applicable standard on a motion to dismiss, and gives short shrift to the
4  valid allegations in the complaints. Each Parent signed an Acquisition Agreement, and that signature
5  must have some purpose and effect. Musser v. Bank of America, 114 Nev. 945, 949, 964 P.2d 51, 54
6  (1998) ("A basic rule of contract interpretation is that 'every word must be given effect if at all
7  possible.'") (quoting Royal Indem. Co. v. Special Serv., 82 Nev. 148, 150, 413 P.2d 500, 502
8  (1966)). Each Parent's signature must, at a minimum, signify an agreement "not to do anything to
9  destroy or injure the right of the other to receive the benefits of the contract" and a "duty not to
10  prevent or hinder performance by the other party." George v. Morton, No. 06 Civ. 1112 (PMP), 2007
11  U.S. Dist. LEXIS 15932, at *22 (quoting Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 107 Nev.
12  226, 234, 808 P.2d 919, 923 (Nev. 1991)). "Nevada law implies into every contract or agreement a
13  covenant of good faith and fair dealing." George, 2007 U.S. Dist. LEXIS 15932 at *21 (denying
14  motion to dismiss alleged breaches of the covenant of good faith and fair dealing); see also Artist
15  Housing Holdings, Inc. v. Davi Skin, Inc., No. 06 Civ. 0893 (RLH), 2006 U.S. Dist. LEXIS 90514,
16  *18 (D. Nev. Dec. 14, 2006) (denying motion to dismiss breach of covenant of good faith claim
17  because "the Court's role at the Rule 12(b)(6) stage is not to evaluate the strength or weakness of
18  claims.").

19        Plaintiff has alleged that the Parents acted in a manner that contravened the spirit and purpose
20  of the Acquisition Agreements, interfered with borrower's performance of the Loan Documents to
21  which defendants expressly consented, and frustrated South Edge's justified expectations by
22  improperly orchestrating the various breaches of the Acquisition Agreement. (¶¶ 11, 47.) These
23  allegations are more than sufficient to entitle Plaintiff to offer proof in support of Count II. See, e.g.,
24  Davi Skin, 2006 U.S. Dist. LEXIS 90514 (denying motion to dismiss claim for breach of the
25  covenant of good faith where plaintiff alleged that (1) certain members of the Mondavi wine family
26  only signed the contract under a heading "agreed and approved" and (2) that Plaintiff would not have
27  entered into agreement without those signatures and backing of the Mondavi family); George, 2007
28  U.S. Dist. LEXIS 15932 (denying motion to dismiss claim for breach of implied covenant of good

1 | faith and fair dealing); Nevada Power Co. v. Calpine Corp., No. 04 Civ. 1526 (PMP), 2006 U.S. Dist.

2 | LEXIS 36135 (D. Nev. June 1, 2006) (denying motion to dismiss same claim, where plaintiff alleged

3 | defendant repudiated contract unless plaintiff agreed to provide additional consideration).

4 |     Moreover, because Plaintiff has alleged a "special relationship" between the Parents of each

5 | Member and both the Plaintiff and South Edge (infra Part IV.D), Plaintiff's second cause of action

6 | provides for relief under both contract and tort theories of recovery. George, 2007 U.S. Dist. LEXIS

7 | 15932, *20-21, 25 (declining to dismiss tort or contract theories for recovery under claim of breach of

8 | covenant of good faith, because plaintiff alleged "special relationship" and "grievous and perfidious

9 | misconduct").  Plaintiff alleges Parent's improper misuse of their influence to essentially deprive

10 | South Edge of its ability to act constitute sufficiently grievous acts to assert a tortious breach of the

11 | covenant.  Consequently, Plaintiff is entitled to discover and offer proof of this alleged tortious

12 | conduct. Id. at *24.  For example, in willful disregard of contractual and legal duties, the Moving

13 | Defendants claim they are free to abandon the project without any consequences.

14
15 |     **D.**    **Plaintiff Adequately Alleges The Moving Defendants Breached Their Fiduciary Duties**

16 |     The Moving Defendants argue Plaintiff's claims related to the various breaches of fiduciary

17 | duties have been waived, but their assertions regarding waiver are unsupportable.  About the only

18 | thing correctly stated by Moving Defendants is that the elements of a breach of fiduciary duty claim

19 | in Nevada are (1) the existence of a fiduciary duty, (2) that the duty was breached, and (3) that

20 | damages were proximately caused by the breach. Cascade Invs., Inc. v. Bank of Am., No. CV-N-99-

21 | 559-ECR, 2000 WL 1842945 (D. Nev. Sept. 29, 2000).

22 |     **1.**    **The LLC Agreement's Alleged Waiver Of Fiduciary Duties Is Invalid**

23 |     Moving Defendants rely heavily on the supposed "waiver" of fiduciary duties in Section 6.6

24 | of the LLC Agreement. (Ex. B.) Such a waiver is invalid under Nevada law.  Nevada's statutes for

25 | partnerships and corporations explicitly outline which duties cannot be waived. See, e.g., Nev. Rev.

26 | Stat. Ann. §87.4316 (stating that a partnership agreement may not eliminate certain minimum duties

27 | of loyalty as outlined in Nev. Rev. Stat. Ann. § 87.4336); Nev. Rev. Stat. Ann. § 78.138 (stating that

28 | in the context of a corporation, directors and officers can be held liable for breach of fiduciary duties

1    and that the articles of incorporation may expand liability).  Further, various states' LLC statutes, as

2    well as the Revised Uniform Limited Liability Company Act, explicitly restrict LLC members'

3    ability to contract away fiduciary duties.  See Revised Uniform Limited Liability Company Act,

4    Section 110(g)(1) (stating "the operating agreement may . . . eliminate or limit a member or

5    manager's liability to the limited liability company and members . . . except for:  breach of the duty

6    of loyalty.").

7         Moving Defendants cite no authority for the proposition that under Nevada law such a waiver

8    is valid, because the Nevada LLC statute contains no such provision.  The two cases cited by

9    Defendants are inapposite, because one purports to interpret California law, Yerkovich v. MCA, Inc.,

10   No. CV-94-03927-ABC, 2000 WL 234591 (9th Cir. Mar. 1, 2000) (discussing California law in a

11   simple contract case) and the other has nothing to do with an LLC.  Yerington Ford, Inc. v. General

12   Motors Acceptance Corp., 359 F. Supp. 2d 1075 (D. Nev. 2004) (dealing with a contract between

13   parties that has nothing to do with any special relationship, such as the members of LLCs have).

14        Because the Moving Defendants have not met their burden at this preliminary stage of the

15   proceedings to show that the fiduciary duty waiver is valid, the motions to dismiss this claim should

16   be denied.  Plaintiff has alleged the existence of non-waivable fiduciary duties and, furthermore, that

17   those duties have been breached by Moving Defendants' self-serving actions and injury to South

18   Edge, causing injury thereby to Plaintiff.

19              **2.   Defendants Have Fiduciary Duties To Creditors That Arise As A Matter**
                **Of Law From Their Control Of South Edge, Which Is Insolvent**
20

21        In addition to the non-waivable fiduciary duties owed by the Members to South Edge that

22   JPMorgan can enforce by the assignment of South Edge's rights and claims, JPMorgan, as creditor to

23   the now insolvent South Edge, is directly owed fiduciary duties by both the Members and Parents.

24   As the Moving Defendants concede, controllers and managers of LLC's owe fiduciary duties to

25   creditors when an LLC is insolvent, consistent with settled law to that effect for corporations and

26   other entities.  In re McCook Metals, L.L.C., 319 B.R. 570, 595 (Bankr. N.D. Ill. 2005) (finding

27   fiduciary duties that extend to creditors when an LLC is insolvent).  However, Moving Defendants

28   claim that because certain individuals, not defendants themselves, are listed as "managers" of South

21

1   Edge, and because the LLC Agreement states that these managers, rather than the Members, control

2   the company, there can be no liability to creditors. At best, this argument raises disputed issues of

3   fact that cannot be resolved on a motion to dismiss.

4       As an initial matter, the named "managers" of South Edge are employees of the Moving

5   Defendants and the other Members, and their sole role as managers of South Edge is to direct South

6   Edge on their companies' (the Moving Defendants') behalf. (See Ex. B (LLC Agreement) at 19-20.)

7   Indeed, in the LLC agreement, each "manager" is listed with the explicit notation of which Member

8   they are affiliated. (Id. at 20-21.) Through their designated "managers"—employees of the Moving

9   Defendants—the Moving Defendants control and manage South Edge, and they, therefore, owe

10   fiduciary duties to Plaintiff as the creditor of an insolvent company. Where a party is, in fact, the

11   controller of an insolvent entity, the duty to creditors extends to that person. Just as controlling

12   shareholders of a corporation are liable for what their controlling directors do wrongfully to the

13   corporation for the benefit of those shareholders, the same is true for LLC members. See, e.g., In re

14   Brown Schools, 386 B.R. 37 (Bankr. D. Del. 2008) (illustrating this corporate director conflicting

15   duty breach of fiduciary duty for the controlling shareholder). Cf. In re Docteroff, 133 F.3d 210,

16   216-217 (3rd Cir. 1997) (finding that although the record did not establish that the defendant was an

17   officer or director of the co-defendant subsidiary corporation, that because he was a director of the

18   parent of the subsidiary, he owed a fiduciary duty to the creditors of the insolvent subsidiary). As in

19   Docteroff, the Members and the Parents, although not defined as "controllers" or "managers" of

20   South Edge in the LLC Agreement, allegedly directed South Edge's actions, and, therefore, owed

21   fiduciary duties to South Edge's creditors, once South Edge became insolvent. Moving Defendants'

22   transparent attempt to escape liability by pointing to their "managers" as the controllers of South

23   Edge, when the managers represent the Moving Defendants, and act at their behest, is strained at best,

24   and should be rejected if for no other reason than it highlights a hotly disputed factual issue that

25   cannot be resolved on the present motion.[14]

26

27      [14] Defendants also inexplicably point to ¶ 5.3 of the LLC Agreement for the proposition that managers are
not liable for breaches of fiduciary duty. However, the language they quote only applies to duties owed to the

28   (continued on next page)

1  South Edge is alleged to be insolvent and that allegation must be taken as true for purposes of
2  this motion. (¶ 52.) Consequently, fiduciary duties run from the controllers of South Edge—alleged
3  to be the Moving Defendants—to creditors such as Plaintiff. Further, Moving Defendants are alleged
4  to have used their control of South Edge to systematically thwart South Edge's abilities to satisfy its
5  debts to Plaintiff, causing injury to Plaintiff. (¶¶ 53, 55.) Plaintiff's claim for breach of fiduciary
6  duty has clearly been pled adequately as to both the Members and the Parents, and should not be
7  dismissed at this early stage.

8  E.   **Plaintiff Adequately Alleges Each Member's Parent Intentionally Interfered**
9        **With The Contractual Relations Between South Edge And Its Members**

10  Plaintiff has stated a valid claim for intentional interference with contract. All the required
11  elements have been alleged: that each Parent improperly interfered with each Member's contracts
12  with South Edge, despite knowledge of the contracts, and caused damages thereby. (¶¶ 47–49.) The
13  Moving Defendants object on the basis that the contracts were not adequately pled, that Plaintiff is a
14  third-party beneficiary, and, alternatively, that each Parent was privileged to interfere in the contracts,
15  because each Member was its subsidiary. (Defs. Br. at 13-17.) In each case, the Moving Defendants
16  are wrong.

17  First, Plaintiff has adequately alleged the existence of the contracts between South Edge and
18  each defendant Member. As described above, each contract was described and attached to the
19  complaints. (See also supra Part IV.B.)

20  Second, as explained above, Plaintiff has standing (UCC § 9-607 (N.R.S. § 104.9607)), as a
21  secured creditor, to assert South Edge's claims. (Supra Part IV.A; see also Ex. D (Deed of Trust) at 4
22  pledging "all... actions and rights in action" of South Edge) (emphasis added). Plaintiff is not a
23  third-party beneficiary but, rather, a secured creditor suing to enforce a claim assigned to it as part of
24  its collateral. The security interests explicitly pledged in the Collateral Documents clearly establish
25  (with each defendant's express consent) Plaintiff's interest in and standing to sue on the basis of the

26  (continued from previous page)
27  Company or to the Members, and is, thus, totally irrelevant in relation to a breach of fiduciary duty owed to a
    creditor.

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  pledged collateral, which in this instance is a valid cause of action for intentional interference with a
2  contract.

3       Third, Moving Defendants assert that a parent is permitted to interfere with its subsidiary's
4  contracts, where the parent acts to protect its economic interest, so long as the interference is not
5  malicious or improper. (Defs. Br. at 15-17.) The Moving Defendants ignore, however, that Nevada
6  does not recognize this alleged privilege. George, 2007 U.S. Dist. LEXIS 15981 at *25 (denying
7  motion to dismiss where defendant claimed a privilege based on financial interest in a contract,
8  because "Nevada law provides only that a party to a contract cannot tortiously interfere with its own
9  contract. Nevada has never extended the doctrine to cover non-parties who have a financial interest
10  in a third party's contract."). The Moving Defendants do not cite any Nevada case holding that—as a
11  matter of law—a parent is always privileged to interfere in the contracts of its subsidiary, even where
12  the Parent has expressly consented to the contract or subordinated its rights in favor of Plaintiff.
13  Whether such a privilege can be asserted is necessarily a factual issue that cannot be resolved at this
14  stage of the case.

15       Even if Nevada recognized a privilege in favor of a parent to interfere in its subsidiary's
16  contracts, it is not a matter that can be decided on a motion to dismiss, especially given the Parents'
17  express consents and subordinations. Courts in this circuit (interpreting the law of other states which
18  recognize such a privilege) have held that this privilege is not properly addressed on the pleadings,
19  because it requires inquiry into a "state of mind" and must be proven as an affirmative defense.
20  Culcal Stylco, Inc. v. Vornado, Inc., 26 Cal. App. 3d 879, 882-83 (1972). Indeed, courts have denied
21  motions to dismiss in the face of a defendant's assertion of a proper motive for interfering with its
22  subsidiary's contracts. City of Oakland v. Comcast Corp., 2007 U.S. Dist. LEXIS 14512 (N.D. Cal.
23  Feb. 14, 2007) (denying motion to dismiss, notwithstanding parent-subsidiary relationship and
24  financial interest that is apparent on the face of the complaint); Pure, Ltd. v. Shasta Beverages, Inc.,
25  691 F. Supp. 1274 (D. Haw. 1988) (denying motion to dismiss and holding that factual issue exists as
26  to motive, which is properly left for further proceedings); Woods v. Fox Broadcasting Sub., Inc., 129
27  Cal. App. 4th 344, 356 (2005) (holding that "[w]hile . . . defendants may attempt to prove that their
28  conduct was privileged or justified, that is a defense which must be pleaded and proved.").

24
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1      Plaintiff adequately alleges each Parent of each Member acted improperly by intentionally

2  causing the Member to breach obligations it knew the Member owed to South Edge. See, e.g.,

3  Matrix Group Ltd. v. Rawlings Sporting Goods Co., 477 F.3d 583, 592 (8th Cir. 2007) (affirming

4  verdict granting plaintiff relief on claim for intentional interference with contract, because jury was

5  entitled to find that parent corporation had unlawfully interfered with its subsidiary's contract by

6  "purposefully causing a breach of contract").   Moving Defendants' arguments are, therefore,

7  unavailing at this stage.[15]

8      **F.**    **Plaintiff Adequately Alleges Claims For Resulting And/Or Constructive Trust**

9      Finally, the Moving Defendants have presented no argument that would satisfy dismissal of

10  the constructive or resulting trust requested by Plaintiff. Plaintiff has alleged various breaches by the

11  Parent of each Member that suffice for purposes of Rule 8 to offer evidence in support of the

12  requested relief. Delano Farms Co. v. California Table Grape Comm'n, No. 07 Civ. 1610 (OWW),

13  2009 U.S. Dist. LEXIS 13081 (E.D. Cal. Feb. 18, 2009) (motion to dismiss claim for constructive

14  trust denied, because this claim is dependent on certain substantive claims, including a claim for

15  unfair competition which was not dismissed). See also DC3 Entm't, LLC v. John Galt Entm't, Inc.,

16  412 F. Supp. 2d 1125, 1151 (W.D. Wash. 2006) (motion to dismiss counterclaim and third-party

17  claim for establishment of a constructive trust must be denied because it is not, "as a matter of law, [a

18  remedy] unavailable" for plaintiff's alleged breach of an implied-in-fact contract).

19      Plaintiff is not seeking specific performance. (Cf. Defs. Br. Part III.E.1, at 18.) Plaintiff

20  seeks the remedy of a trust in order to safeguard any funds recovered from Moving Defendants, to

21  ensure those funds are used only for the purposes they are intended for. As alleged, the defendants

22  breached their obligations under the Acquisition Agreements, each of which was assigned to Plaintiff

23

24  [15] Moving Defendants' reliance on Bendix and Leavitt is misplaced. Bendix is unavailing because it interprets Alaska state law in the face of contradictory Nevada state law. George, 2007 U.S. Dist. LEXIS

25  15981 at *25. And, Leavitt discusses the tort of wrongful interference with prospective economic advantage, which has a separate independent wrongful act requirement that interference with contract does not have.

26  Nevada law has not yet held that a plaintiff alleging intentional interference with contractual relationship must also prove the absence of privilege or justification. Nationwide Transp. Fin. v. Cass Info. Sys., 523 F.3d 1051,

27  1056 (9th Cir. Nev. 2008); see also Sutherland v. Gross, 105 Nev. 192, 196-97, 772 P.2d 1287, 1290 (Nev. 1989) (setting forth the elements of intentional interference with contractual relationship under Nevada law).

28

1   by the Assignment of Acquisition Agreements executed by defendants with a subordination of their

2   rights in favor of Plaintiff. (¶¶ 61-62.) The relief sought must include the Parent of each Member,

3   because, as alleged in the complaints and discussed above, each Parent induced the alleged breaches.

4   (¶¶ 11, 47; see also supra Parts IV.C–E.) Thus, any recovery from the Parent under these claims

5   should be placed in trust, and not simply delivered to South Edge, which is controlled by the Moving

6   Defendants.

7         Finally, Moving Defendants' argument that the requested relief must be denied on the basis of

8   the absence of any "confidential relationship" or the "intent to create a trust relationship" (Defs. Br.

9   at Parts III.E.2–3, at 19-21) must fail, because Plaintiff has alleged a confidential relationship

10  between the parties (supra Part IV.D; ¶¶ 50-55), as well as defendants' signed consents and

11  subordinations. This allegation satisfies the "short and plain statement" required by Rule 8.

12  V.    CONCLUSION

13        For the foregoing reasons, Plaintiff respectfully submits that the Moving Defendants' motions

14  to dismiss be denied.

15

16  Dated:  March 19, 2009                    Respectfully submitted,

17                                             SYLVESTER & POLEDNAK, LTD.

18

19                                   By:    /S/ Jeffrey R. Sylvester
                                           Jeffrey R. Sylvester
20                                         7371 Prairie Falcon Road, Suite 120
                                           Las Vegas, Nevada 89128
21                                         Tel.: (702) 952-5200
                                           Fax: (702) 952-5205
                                           jeff@sylvesterpolednak.com
22
                                           James E. Hough (admitted pro hac vice)
23                                         MORRISON & FOERSTER LLP
                                           1290 Avenue of the Americas
24                                         New York, New York 10104-0050
                                           Tel.: (212) 468-8000
25                                         Fax: (212) 468-7900
                                           jhough@mofo.com
26
                                           Attorneys for Plaintiff JPMorgan Chase
27                                         Bank, N.A.

28