UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A., | |
| Plaintiff, | 2:08-cv-1711-PMP-RJJ |
| vs. | |
| KB HOME and KB HOME NEVADA INC., *et al.,* | O R D E R |
| Defendant, | |
| AND RELATED THIRD-PARTY COMPLAINT. | |

This matter is before the Court on Home Builder Defendants' Motion to Compel Plaintiff JPMorgan Chase Bank, N.A. to Produce Documents in the Possession or Control of the Other Lenders (#163).

The Court has reviewed the Motion (#163), the Opposition (#174), and the Reply (#182), and has heard the argument and representations of the parties at the hearing.

**BACKGROUND**

On November 9, 2009, all Defendants with the exception of Focus South Group, LLC, John A. Ritter, Alameda Investments, and Woodside Group, Inc. (Alameda and Woodside have filed for bankruptcy protection) filed this motion requesting an order compelling JPMorgan to "produce documents in the possession or control of (a) those lenders on behalf of which, as administrative agent, it entered into the credit agreements and other related agreements at issue in these actions [original lenders]; and (b) to the extent they are different, those lenders on behalf of

which, as administrative agent, it commenced and continues to prosecute these actions [current debt holders]."

Defendants are five of eight members that formed "South Edge" for the purpose of acquiring land to develop Inspirada. In October 2004, before bidding for the property or obtaining financing, the South Edge members entered into an Operating Agreement which governs the organization, management, and obligations of South Edge and its members. South Edge and each of its members also executed an Acquisition Agreement granting each member the right to purchase from South Edge, or "takedown", certain parcels of land within the Inspirada project.

South Edge needed to borrow more than $500 million to finance the project. South Edge enlisted JPMorgan to help it secure the necessary funds for the project. In order to facilitate such a large loan, JPMorgan sought access to capital outside traditional "bank lenders" by seeking investors in debt that could be traded on the secondary loan market. JPMorgan structured a loan that included four separate "facilities". Facility A was a traditional construction loan to be drawn down over time. Facilities B and C were term loans fully funded at closing and designed to be packaged, sold, and traded on the secondary market (Facility B has been paid in full). Facility D was reserved for letters of credit that South Edge expected to require during the course of development. With this structure in place, the original Credit Agreement was signed and JPMorgan and multiple lenders agreed to loan South Edge $535 million.[1] In return, JPMorgan and the Lenders received, among other things, a security interest in the property and an assignment of the Acquisition Agreements between South Edge and its members. The Defendants are not parties to the credit agreement but did execute "Completion Guaranties" which JPMorgan asserts require Defendants to guarantee the construction of certain infrastructure improvements on the property. In late 2006 and early 2007, the original Credit Agreement was modified to include a $50 million increase in Facility A (the construction loan).

---

[1] At all relevant times, JPMorgan communicated with all lenders through an "Interlinks" website maintained by JPMorgan. The site served as a repository for all documents and official communications provided by JPMorgan and the lenders.

1  Based on the parties' moving papers, this modification was relatively minor but did add a couple
2  of lenders to the Facility A loan package.
3        On December 5, 2008, JPMorgan <u>acting as Administrative Agent for the lenders under
4  the Credit Agreement</u>, filed several lawsuits seeking to enforce purported rights of South Edge
5  under the Operating Agreement and Acquisition Agreement against the individual Defendants.
6  JPMorgan, in the same capacity, also filed several complaints seeking to enforce the Completion
7  Guaranties against the individual Defendants.  A total of fourteen (14) cases have been
8  consolidated for pre-trial purposes.
9        On September 11, 2009, Defendants served their first Rule 34 requests on JPMorgan (97
10 requests).  The  requests for production defined "Lenders" as those entities listed in Schedule 1 to
11 the Credit Agreement or the Amended Credit Agreement[original lenders], as well as any entity
12 to which any of those Credit Agreement Lenders had assigned any of their debt and any entities
13 that continue to hold debt related to the Credit Agreements[current debt holders].  There are 37
14 requests asking JPMorgan to produce categories of documents in the possession, custody or
15 control of the Lenders.  The categories of documents mirror those requested from JPMorgan.  In
16 its general objections to the Rule 34 requests, JPMorgan objected to the extent that the requests
17 attempt to impose a discovery obligation on any person who is not a party to the litigation or to
18 the extent they seek information not in the possession, custody, or control of JPMorgan.
19 JPMorgan also objected to the definition of "Lenders" on the same grounds.  In response to the
20 specific individual requests seeking production from "Lenders", JPMorgan responded that it
21 would produce responsive documents in its own possession, custody, or control, but "would not
22 search for responsive documents in the possession, custody, or control of any of the other
23 Lenders."  JPMorgan also objected on the grounds that documents from the Lenders are "not
24 likely to be relevant" as well as "likely to be duplicative".
25       On November 4, 2009, Defendants filed this motion to compel.  The parties
26 telephonically conferred on October 22, 2009, prior to bringing the motion.  There is very little
27 discussion regarding the conversation which took place during the meet and confer.   The
28 Defendants position is simple.  JPMorgan is the Administrative Agent for the Lenders and filed

1  suit in that capacity.  As the Administrative Agent for the current debt holders/original lenders
2  under the terms of the Credit Agreement it is JPMorgan's responsibility to ensure cooperation.
3  The Defendants also seek an order stating that they are entitled to take discovery of the Lenders
4  by serving that discovery on their Administrative Agent JPMorgan.

5       One of JPMorgan's primary complaints is that, as defined in the requests, the term
6  "Lender" includes all of the original Lenders and all Lenders who bought, sold, assigned, or
7  traded South Edge debt at any time.  To JPMorgan's knowledge, this includes at least 206
8  separate entities – the vast majority of which JPMorgan alleges purchased the debt in the
9  secondary market and are simply passive investors.  The definition, although poorly articulated,
10  should be understood to mean all original lenders and all current debt holders who may have
11  purchased interests on the secondary market from the original lenders.

## DISCUSSION

13       Federal Rule of Civil Procedure 26 permits a party to seek "discovery regarding any
14  matter, not privileged, that is relevant to the claim or defense of any party ...." Fed. R. Civ. P.
15  26(b)(1).  Relevant information need not be admissible so long as it is reasonably calculated to
16  lead to the discovery of admissible evidence.  *Id*.  Rule 26 is accorded broad and liberal treatment
17  by the courts because "wide access to relevant facts serves the integrity and fairness of the
18  judicial process by promoting the search for truth." *Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423
19  (9th Cir. 1995).  Accordingly, "discovery should be allowed unless the information sought has no
20  conceivable bearing on the case." *Jackson v. Montgomery Ward & Co., Inc.*, 173 F.R.D. 524,
21  528 (D. Nev. 1997).  Additionally, [r]elevance is broadly construed and a request for discovery
22  should be considered relevant if there is any possibility that the information sought may be
23  relevant to the claim or defense of any party." *City of Rialto v. U.S. Dept. of Defense*, 492
24  F.Supp.2d 1193, 1202 (C.D. Cal. 2007).  However, the scope of discovery is not boundless and
25  requests must be relevant and cannot be unreasonably cumulative, duplicative, or unnecessarily
26  burdensome. *Jackson*, 173 F.R.D. at 526.
27  . . . .
28  . . . .

**1. Relevance**

As a threshold issue, the Defendants, as the parties seeking discovery, bear the burden of demonstrating the requests are relevant under the broad standard of Rule 26. In the context of what has been presented, it is difficult to evaluate whether the requests are relevant because the parties do not appear to be at odds over specific requests. Rather, the dispute arises because JPMorgan claims that the requests are not relevant as to the rights under the Operating Agreement or the meaning and operation of the Completion Guaranties.

JPMorgan claims that only documents from the parties that negotiated the Operating Agreement are relevant to determining the rights under the Operating Agreement. Because JPMorgan, as Administrative Agent, conducted the negotiation on behalf of all other Lenders it claims that only its production is relevant. This narrow approach is rejected. JPMorgan was negotiating on behalf of a large group of sophisticated financiers. It is simply not credible that only JPMorgan maintained documents or that only JPMorgan's documents may shed light on the rights arising from the Operating Agreement. Certainly the original lenders may have relevant information regarding the Operating Agreement. It appears that approximately 125 Lenders signed the Amended and Restated Operating Agreement. Further, Judge Pro recently ruled on the Defendants motion to dismiss and found that the Credit Agreement documents are ambiguous as to whether the parties even intended to give JPMorgan and the Lenders a security interest in the Operating Agreement.

JPMorgan also claims that the Defendants' claim that the current debt holders/original lenders may have documents related to the meaning and operation of the Completion Guaranties fails because there has been no determination and no claim that the there is anything vague or ambiguous about the Completion Guaranties. Thus, there is no need for extrinsic evidence. However, the Defendants have alleged as an affirmative defense that the Completion Guaranty is void for indefiniteness. It is entirely possible that the Lenders have relevant documents. Again it is difficult to determine because the parties are not disputing specific requests.

Finally, JPMorgan claims that any Lenders who purchased debt in the secondary market, which includes a majority of the Lenders, could not have relevant documents to any Agreements

1  because the debt was purchased after the relevant agreements were consummated. It is entirely
2  possible that the Lenders have relevant documents. JPMorgan's attempt to circumvent the
3  attempt to even ask is simply incorrect. If JPMorgan has no right to demand production then it
4  has no right to raise objections on the original lenders/current debt holders behalf.

**2. Possession, Custody, or Control**

Federal Rule of Civil Procedure 34 permits a party to serve on any other party a request, within the scope of Rule 26(b) to produce documents and information in the responding party's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). JPMorgan's primary contention in regard to the Rule 34 requests is that they seek production of documents not in the control of JPMorgan. The argument fails.

For the entirety of their motion, Defendants rely on a single case -- *JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505 (S.D.N.Y. 2005). In *Winnick* the court was faced with practically identical issues to those currently before the court. JPMorgan, in its capacity as Administrative Agent under a Credit Agreement, brought a lawsuit against parties with whom it and a consortium of lenders had extended loans. JPMorgan claimed authority to bring the action on behalf of the banks and/or their assignees. The defendants in *Winnick* served discovery requests on JPMorgan. The court in *Winnick* addressed the issue of JPMorgan's position as administrative agent for multiple lenders and the lender's discovery obligations. JPMorgan objected to the discovery and argued that the documents sought from other lenders were not in their possession, custody, or control; the lenders were not parties to the litigation; the lenders had transferred their interests in the debt to other investors who purchased the debt on the secondary market; that it was not more burdensome for defendants to obtain the discovery than it was for JPMorgan; and that defendants are better situated to compel/enforce disputed discovery. In resolving the dispute, the *Winnick* court stated:

> Viewed from any angle [JPMorgan's] position cannot be correct. It is both logically inconsistent and unfair to allow the right to sue to be transferred to assignees of a debt free of the obligations that go with litigating a claim .... On [JPMorgan's] theory, by assigning their tort claims [through selling debt on the secondary market], the lenders also shifted onto the defendants the cost of third-party discovery, where the third parties are the very institutions asserting [claims] .... It would be unfair to the defendants to permit plaintiff and the [current debt

> holders] to divorce the benefits of the claims from the obligations that come with the right to assert them, to the detriment of the defendants.

The court recognized that the burden on JPMorgan was substantial. However, the court determined that the claims being asserted were those of the original lenders and could not be asserted by an agent or an assignee without the concomitant obligation to produce relevant discovery to the defendants. Any failure to obtain rights to insist on cooperation in discovery was the fault of JPMorgan's and is therefore the plaintiff's problem, not the defendants. Here, JPMorgan attempts to distinguish the case on the grounds that (1) the standard for control in the Rule 34 setting is higher in the Ninth Circuit than in the Second Circuit (where *Winnick* was decided) and (2) that the issue in *Winnick* involved whether the lenders relied upon representations by the defendants when they purchased the debt. Defendants acknowledge that the Ninth Circuit defines control, for purposes of a Rule 34 request, as the legal right to obtain documents upon demand, while the Second Circuit defines control as the "practical ability" to obtain the documents from a non-party. However, Defendants are correct that the distinction was irrelevant in *Winnick* and is irrelevant here.

In determining whether a party has control for purposes of a Rule 34 request, the court looks at the relationship between the parties. Here, JPMorgan is the Administrative Agent authorized to bring suit on behalf of the current debt holders and original lenders to enforce a Credit Agreement. This agency relationship is sufficient to find control for purposes of Rule 34.

Moreover, there were two issues in *Winnick* -- whether JPMorgan had to produce documents held by current lenders for which it was acting as agent in filing the lawsuit and, whether JPMorgan and the current debt holders had to produce documents held by original lenders that had made the loan but sold their interests on the secondary market. The court decided the first issue by finding that the current debt holders were real parties in interest who had sued through JPMorgan acting as an administrative agent. The court decided the second issue by requiring JPMorgan and the other current debt holders to produce documents held by Assignor Lenders, not because of any practical ability to do so, but because it was "both logically inconsistent and unfair to allow the right to sue to be transferred to assignees free of the

1  obligations that go with litigating the claim." 228 F.R.D. at 506.  Far from finding that
2  JPMorgan had any practical ability to obtain the documents, the *Winnick* court expressly
3  recognized that JPMorgan and current debt holders might not be able to obtain discovery from
4  Assignor Lenders.  However, the court held that that problem was better left in the lap of
5  JPMorgan and the other plaintiffs rather than dumped in the lap of defendants.

6  JPMorgan's attempt to distinguish *Winnick* on the ground that the issues within the
7  litigation are different falls flat.  It is not really important why the requested discovery may have
8  been relevant in *Winnick*.  The court's only concern is whether the requested documents are
9  relevant to the issues in this case -- which they are.

10  **3. Duplicative and Burdensome**

11  JPMorgan argues that the request should be denied because any production is "likely" to
12  be duplicative of JPMorgan's production.  JPMorgan asserts that because it has agreed to produce
13  communication from it to the Lenders and from the Lenders to it, any further production would
14  be duplicative.  The argument fails.  It is impossible to tell from the filing whether there would
15  be any duplication.  There are 37 requests that have been objected to and they request a wide
16  range of documents -- and the only issue raised is whether JPMorgan should bear the burden of
17  ensuring cooperation.

18  JPMorgan's argument that the requests are burdensome also fails.  The Court in *Winnick*
19  addressed this issue as well.  First, insofar as JPMorgan has brought claims on behalf of itself
20  and current debt holders, it is axiomatic that the current debt holders are real parties in interest.
21  As such, they must produce documents through JPMorgan, their acting Administrative Agent, or
22  risk sanctions.  As for the original lenders, the question is who should properly bear the risks and
23  burdens associated with discovery.  Just as in *Winnick*, the most reasonable conclusion is that
24  JPMorgan and the current debt holders should bear the cost of discovery in relation to the
25  original lenders.  JPMorgan and most current debt holders are suing in the shoes of the original
26  lenders.  It would be unfair to allow JPMorgan and the current debt holders to stand in the shoes
27  of the original lenders in order to pursue this action without requiring them to produce discovery
28  that the original lenders would be required to produce if they had brought the action themselves.

Good cause appearing therefore,

IT IS HEREBY ORDERED that Home Builder Defendants' Motion to Compel Plaintiff JPMorgan Chase Bank, N.A. to Produce Documents in the Possession or Control of the Other Lenders (#163) is GRANTED.

IT IS FURTHER ORDERED that production shall be made on or before May 28, 2010.

DATED this 18th day of May, 2010.

ROBERT J. JOHNSTON
United States Magistrate Judge