UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., | ) | 2:08-CV-01711-PMP-RJJ |
| | ) | BASE FILE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KB HOME et al., | ) | ORDER |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| AND ALL RELATED ACTIONS | ) | |
| | ) | |

Presently before the Court is Defendant KBHome and KBHome Nevada Inc.'s ("KB") Emergency Motion for a Preliminary Injunction Enjoining JPMorgan Chase Bank, N.A. from Further Converting Major Infrastructure Deposits (Doc. #296), filed on July 2, 2010. Defendants Coleman-Toll Limited Partnership, Toll Brothers, Inc., Pardee Homes of Nevada, Weyerhauser Real Estate Company, Meritage Homes of Nevada, Meritage Homes Corporation, Beazer Homes Holdings Corp., and Beazer Homes USA, Inc. filed Joinders (Doc. #298, #299, #300, #302) to KB's motion. Plaintiff JPMorgan Chase Bank, N.A. ("JPMorgan") filed an Opposition (Doc. #308) on July 19, 2010. KB filed a Reply (Doc. #316) on July 30, 2010. The Court held a hearing on this motion on August 6, 2010. (Mins. of Proceedings (Doc. #324).)

This case arises out of a stalled real estate development project. The present dispute centers around whether the Court should enjoin the lender, JPMorgan, from further drawing on letters of credit posted by certain Defendants in relation to the project.

## I. BACKGROUND

In 2004, KB Home Nevada, Inc., Focus South Group, LLC, Coleman-Toll Limited Partnership, Alameda Investments (Woodside), LLC, Kimball Hill Homes Nevada, Inc., Pardee Homes of Nevada, Meritage Homes of Nevada, Inc., and Beazer Homes Holdings Corp. ("Builders") formed South Edge, LLC ("South Edge") to purchase nearly 2000 acres of vacant real estate in the City of Henderson, Nevada, from the Bureau of Land Management, with the goal of developing the property into a master planned community called "Inspirada." To purchase the land, South Edge obtained a loan from a consortium of lenders, for which JPMorgan acts as the Administrative Agent. Generally, the development plan called for Builders, as Members of South Edge, to "take down" pods of land to develop at certain intervals. The repayment of the loan to JPMorgan was tied to the takedowns. To effectuate the project, the Builders, South Edge, and JPMorgan entered into a series of interrelated agreements governing the parties' rights and obligations.

To form South Edge, the Builders entered into an Operating Agreement which provided for development and contemplated financing arrangements. South Edge and the Builders also entered into an Acquisition Agreement which outlined the rights and obligations in relation to the Builders performing their takedowns and acquiring the pods.

Pursuant to the Operating and Acquisition Agreements, when a South Edge Member took down its pod of land, it was required, among other things, to post major cost deposits ("MI Deposits") to cover general infrastructure costs at Inspirada. Section 2.3.6 of the Operating Agreement provided that the MI Deposits be in the form of either a cash deposit or a letter of credit. Pursuant to section 2.3.6, "[n]o material expenditures for Major Infrastructure Costs shall be made except pursuant to the Business Plan or as approved by [South Edge's] Management Committee." Section 3 of the Acquisition Agreements states that upon takedown of a pod, the Builder shall deposit the MI Deposit, and–

///

        Unless otherwise required by the "MI Financing," the Builder MI Deposit may be in the form of a commercial letter of credit for such amount and in form and substance satisfactory to the Management Committee of [South Edge]. . . . Unless otherwise required by the "MI Financing," the Builder MI Deposit shall be deposited at each Takedown into a third-party construction control account (the "MCD Account") to be administered by an agent selected by the Management Committee of [South Edge] or otherwise in accordance with the Operating Agreement (the "Disbursement Agent"). The MCD Account shall be governed by a disbursement agreement, . . . provided, however, that such disbursement agreement shall be subject to such additional modifications as are required by the MI Financing. Unless otherwise required by the MI Financing or as otherwise provided herein with respect to the Builder MI Deposit, funds in the MCD Account shall be released from the MCD Account to [South Edge] for the purpose of paying the Builder MI Costs on a progress of construction basis. . . . . Except in the case where the Builder MI Deposit represents one hundred percent (100%) of the Builder MI Costs for the applicable Takedown, and unless otherwise required by the MI Financing, the Builder MI Deposit for such Takedown shall be utilized by [South Edge] to pay the last of the Major Infrastructure Costs to become due for such Takedown; provided however, that if, upon completion of the Major Infrastructure for a phase ("MI Phase") and payment of all Builder MI Costs for such MI Phase, [South Edge] may release funds from the MCD Account for such completed MI Phase to Builder . . . .

To obtain the funds to purchase the property from the Bureau of Land Management, South Edge entered into a Credit Agreement with JPMorgan. Under section 7.03(b)(iii) of the Credit Agreement, it was a condition of JPMorgan's release of a phase to a Member that "unless such Member's Parent Guarantor has a senior unsecured debt rating of at least BB- from S&P or Ba3 from Moody's or at least an NAIC2 rating, such Member shall deposit in a Cash Collateral Account with the [JPMorgan] funds, and/or furnish to the [JPMorgan] a Qualified Letter of Credit . . ." to cover the Member's MI Deposit. Section 7.03(b)(iv) of the Credit Agreement provides that if the Member acquiring the pod does not have to make a deposit in a Cash Collateral Account as set forth in subsection (iii), but is obligated to make a MI Deposit under Section 2.3.6 of the Operating Agreement, the Administrative Agent "may, at its election, require that the [MI Deposit] be deposited in a Cash Collateral Account with [JPMorgan], in which event (subject to the provisions of

Section 9.05) [JPMorgan] shall advance the funds so deposited in accordance with Section 2.3.6 of the Operating Agreement."

In Section 9.05(a) of the Credit Agreement, South Edge grants JPMorgan a security interest in all of South Edge's rights in the Cash Collateral Accounts.  Section 9.05(c) provides that so long as there is no default, funds in a Cash Collateral Account "may be used solely for the purpose provided for in the section of this Agreement pursuant to which such funds were deposited" in the account.  However, in the event of a default, "funds in any Cash Collateral Account may be used to pay any Secured Obligations, provided, however, that funds deposited in a Cash Collateral Account by or on behalf of a Member pursuant to Section 7.03(b) may only be used to pay such Member's Adjusted Pro Rata Share of such Secured Obligations."  Obligations are defined to include reasonable attorneys' fees.  Section 9.06 provides that for any Qualified Letter of Credit delivered to JPMorgan pursuant to Sections 5.09, 7.03(b), or 9.07 of the Credit Agreement, JPMorgan may draw upon it only for the specified purposes unless there has been an event of default that is continuing.  After a continuing event of default, JPMorgan "may draw upon any Qualified Letter of Credit in the full amount thereof and apply the amount drawn as provided in, and subject to the provisions of, Section 9.05(d)."

In conjunction with executing the Credit Agreement, South Edge and JPMorgan entered into an Assignment of Acquisition Agreements.  Under the Assignment, South Edge "assigns, transfers, sets over and pledges to [JPMorgan], and hereby grants to [JPMorgan] a security interest and Lien in, to and against, all of [South Edge's] right, title and interest, powers, remedies, privileges and other benefits, whether now owned or hereafter acquired in, to and under the Acquisition Agreements."  Upon an event of default, JPMorgan had the right to enforce any of South Edge's rights under the Acquisition Agreements.

In April 2007, in association with the first takedowns, the Builders made MI Deposits in the following amounts via letters of credit:

| | | | |
|---|---|---|---|
| KB | $4,979,886 | Coleman-Toll | $1,213,609 |
| Alameda | $2,512,110 | Meritage | $1,133,747 |
| Kimball | $1,800,799 | | |

KB made an additional MI Deposit in October 2007 by increasing its existing letter of credit. At the time it created and increased its letter of credit, KB had a rating of BB+ from S&P and Ba1 from Moody's. Kimball posted an additional letter of credit in the amount of $10,685,979. Focus made its MI Deposit in the amount of $30,948,897 in cash around that same time.

Builders thereafter defaulted on the loan, and no further MI Deposits have been made. Starting in July 2008, JPMorgan started to draw on the letters of credit posted as MI Deposits. At the time JPMorgan drew on the letters of credit, KB and Toll sent letters to JPMorgan protesting the draws on the basis that no event of default had occurred. However, KB and Toll did not assert that JPMorgan was not entitled to make the draws upon an event of default.

According to Builders, JPMorgan produced to them for the first time in March 2010 account statements for each of the MI Deposits. JPMorgan also disclosed it was using the MI Deposits to pay not only costs associated with keeping the Inspirada project afloat, but also to pay JPMorgan's litigation costs in this action. Builders contend that JPMorgan has converted and improperly is using money from Builders' MI Deposits because the relevant agreements provide that the MI Deposits can be used only for major infrastructure construction. Builders contend JPMorgan instead has drawn on the letters of credit to fund this litigation and to fund Focus's arbitration. Builders move for a preliminary injunction seeking to enjoin JPMorgan from drawing on Builders' letters of credit to fund JPMorgan's litigation expenses in this action. Builders also seek to amend their Counterclaims to add claims for conversion and declaratory relief. JPMorgan opposes the motion, arguing that Builders are unable to show imminent, irreparable injury. JPMorgan also argues that it has

a right to draw on the letters of credit under the various interlocking agreements.  JPMorgan opposes amendment, asserting it is untimely and Builders have not shown good cause for the delay.

**II. MOTION FOR PRELIMINARY INJUNCTION**

To obtain a preliminary injunction, Builders must show by a preponderance of the evidence that they are "'likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'"  Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008)).  "Typically, monetary harm does not constitute irreparable harm." Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 851 (9th Cir. 2009).

Builders have failed to show they are likely to suffer irreparable injury in the absence of a preliminary injunction.  The dispute over JPMorgan's draws on the letters of credit is a dispute over money which can be remedied through money damages.  There is little threat that JPMorgan would be unable to pay any judgment should Builders ultimately prevail, as Builders themselves note JPMorgan has substantial assets.  To the extent Builders contend the MI Deposits are necessary to ensure liquidity to complete major infrastructure at Inspirada, the MI Deposits contractually were designated to pay the last infrastructure deposits for any particular phase.  Because Builders have not performed any more development or takedowns, and there is no plan to do so in the foreseeable future, there is no immediate need for the funds or a need to ensure a reserve of funds remains available.

Further, Builders have known about the draws on the letters of credit for two years.  KB and Toll both sent JPMorgan letters complaining about the draws in July 2008. Having known about the draws for two years now, Builders cannot complain that injunctive relief is now necessary.  Builders contend it is JPMorgan's use of the funds to pay its own

litigation costs which triggered the need for injunctive relief, but Builders have known about JPMorgan's use of the funds since March, yet Builders waited until July to move for injunctive relief.  Builders' delay further suggests no irreparable injury is at stake.

Moreover, the balance of equities does not tip in Builders' favor.  Inspirada's completion is in jeopardy because South Edge has not performed and has ceased development on the project, not because JPMorgan has drawn on the letters of credit.  The Court therefore will deny KB's motion for a preliminary injunction to enjoin JPMorgan from further drawing on the letters of credit.

KB argues that even if JPMorgan is entitled to draw on the letters of credit, it must do so on a pro rata basis, and JPMorgan has not done so.  KB thus requests that JPMorgan be enjoined from drawing on the letters of credit or cash MI Deposits disproportionately.  Pursuant to section 9.05(a) of the Credit Agreement, in the event of a default, JPMorgan may use funds in a Cash Collateral Account to pay "any Secured Obligations, provided, however, that funds deposited in a Cash Collateral Account by or on behalf of a Member pursuant to Section 7.03(b) may only be used to pay such Member's Adjusted Pro Rata Share of such Secured Obligations."  KB has not presented evidence rebutting JPMorgan's contention that KB's pro rata share of the Secured Obligations currently far exceeds the total amount of its letter of credit.  Consequently, JPMorgan could draw on KB's entire letter of credit without exceeding KB's pro rata share of the Secured Obligations.  The Court therefore will not enjoin JPMorgan from drawing disproportionately on the letters of credit or cash MI Deposits.

**III.  MOTION TO AMEND**

In conjunction with the motion for preliminary injunction, KB requests leave to amend to add counterclaims for conversion and declaratory relief in relation to JPMorgan's draw on the letters of credit.  JPMorgan opposes the motion to amend.

///

7

The Court will deny the motion to amend. Builders offer no points and authorities in support of their request to add new claims. See L.R. 7-2(a). The motion also is untimely, as the deadline to amend passed several months ago. Builders have shown no good cause to extend the deadline. The good cause standard "primarily considers the diligence of the party seeking the amendment." Coleman v. Quaker Oats Co., 232 F.3d 1271, 1294 (9th Cir. 2000) (quotation omitted). Builders have known about JPMorgan's draws on the letters of credit for two years, and have known about JPMorgan's use of the funds to finance this litigation since March. Yet Builders did not move to amend to add these claims until early July, despite the fact that Builders had pending before this Court another motion to amend to add other claims. Although that motion was filed in February, before Builders learned JPMorgan was using the money to fund its litigation costs, Builders could have sought to add the claims earlier. Builders contend they did not act because the parties were in the midst of settlement talks; however, the settlement talks have not prevented these parties from briefing other motions or otherwise pressing their positions in this case. Builders have not shown diligence in seeking amendment, and the Court therefore will deny the request to amend.

**IV. CONCLUSION**

IT IS THEREFORE ORDERED that Defendant KBHome and KBHome Nevada Inc.'s ("KB") Emergency Motion for a Preliminary Injunction Enjoining JPMorgan Chase Bank, N.A. from Further Converting Major Infrastructure Deposits (Doc. #296) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants KB Home and KB Home Nevada Inc.'s Motion for Order Permitting Defendants to File a Reply Brief in Excess of Twenty Pages (Doc. #315) is hereby GRANTED.

///

///

IT IS FURTHER ORDERED that Plaintiff JPMorgan Chase Bank N.A.'s Motion to Strike Defendants KB Home and KB Home Nevada's Untimely Reply to Their Motion for Preliminary Injunction (Doc. #318) is hereby DENIED.

DATED: September 26, 2010

_____
PHILIP M. PRO
United States District Judge