UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., | ) ) | 2:08-CV-01711-PMP-RJJ BASE FILE |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KB HOME et al., | ) | ORDER |
| Defendants. | ) ) | |
| AND ALL RELATED ACTIONS | ) ) ) | |

Presently before the Court is Plaintiff JPMorgan Chase Bank, N.A.'s ("JPMorgan") Motion Seeking Leave to Amend the UCC Complaints Against the Home Builder Defendants (Doc. #228), filed on February 12, 2010. Defendants filed an Opposition (Doc. #238) on March 17, 2010. Plaintiff filed a Reply (Doc. #245) on March 26, 2010. The Court held a hearing on this motion on August 6, 2010. (Mins. of Proceedings (Doc. #324).)

The parties are familiar with the factual predicate for this case, and the Court will not repeat the facts here except where necessary. JPMorgan contends it has learned through discovery of fraudulent acts by Defendants ("Builders") and their parent companies ("Parents"), and now seeks to amend to add claims for intentional interference with contractual relations, fraud in the inducement, payment due under the limited guarantees, and declaratory relief. JPMorgan contends it learned through discovery that since April 2008 the Builders repeatedly have purported to change the dates of their takedowns

scheduled in the Acquisition Agreement by extending the deadlines starting in April 2008 and continuing to the present. JPMorgan contends Builders failed to inform JPMorgan of these changes, even though all of the relevant agreements require JPMorgan's consent to any modification to the takedown schedule. JPMorgan contends the failure to inform it of these changes fraudulently induced JPMorgan to enter into the Forbearance Agreement ("FA"), triggered the limited guarantees executed by each Builder, and disrupted the contractual relationship between JPMorgan and South Edge. JPMorgan also seeks a declaration that these acts are null and void. JPMorgan contends there is no prejudice as the action still is in its early stages in this Court. Builders respond that amendment should be denied because it is futile, untimely, and prejudicial.

      Generally, a plaintiff may amend his or her complaint once "as a matter of course" within twenty-one days after serving it, or twenty-one days after service of a responsive pleading or motion. Fed. R. Civ. P. 15(a)(1). In all other cases, a party may amend its pleading only by leave of court or by written consent of the adverse party. Fed. R. Civ. P. 15(a)(2). "The Court should freely give leave when justice so requires." Id.; see also Foman v. Davis, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."). The Court considers five factors in deciding whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether plaintiff has previously amended his complaint." Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990) (citing Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989)). The futility analysis determines whether the proposed amendment would survive a challenge of legal insufficiency under Federal Rule of Civil Procedure 12(b)(6). Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988).

///

////

**A. Futility**

    1.  Intentional Interference With Contractual Relations

Builders argue this claim is futile as against the Parents because they did not vote or cause South Edge's Members to vote to extend the takedown schedule. Further, Builders argue it is not intentional interference for limited liability company ("LLC") managers to cast votes affecting the LLC. JPMorgan responds that its claim is not alleged against either South Edge as the LLC, or its members in their capacity as members. Rather, because the Members are parties to the Acquisition Agreement, to extend the takedown schedules any amendment had to be signed by the Members both as members of the LLC and as counter-parties to the Acquisition Agreements. As to the Parents, JPMorgan alleges the Parents engaged in the same acts through their control of the Members.

Under Nevada law, to state a claim for intentional interference with contractual relations, a plaintiff must allege:

> (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.

J.J. Indus., LLC v. Bennett, 71 P.3d 1264, 1267 (Nev. 2003). The defendant's "mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff." Id. at 1268.

The Acquisition Agreements, which contain the takedown schedules, are contracts between South Edge and each Member Builder. The Builders thus signed the Acquisition Agreements as counter-parties with South Edge. The Acquisition Agreements provide that "[n]o addition to or modification of any term or provision of this Agreement shall be effective unless set forth in writing and signed by both Parties." As a result,

1  JPMorgan plausibly alleges that each Member not only voted as Members of the LLC to
2  extend the takedown schedule, they also agreed to the extensions as counter-parties to the
3  Acquisition Agreement.  The claim therefore is not futile as against the Builders.
4         As to the Parents, JPMorgan points to paragraphs 13, 36, 47, and 127 in support
5  of this claim.  Paragraph 13 does not allege any facts, it states only that this action seeks to
6  hold the Parents liable for, among other things, wrongful interference with the contracts
7  between the Members and South Edge.  Paragraph 36 states that the Parents have interfered
8  with South Edge's and JPMorgan's rights with respect to the Acquisition and Operating
9  Agreements "by failing and refusing to permit and enable Defendant Member to honor its
10 obligations to complete land purchases as set forth therein."  This allegation does not allege
11 the Parents induced the Members to amend the takedown schedules.  Paragraph 47 states
12 only that each Parent signed the Acquisition Agreement and sets forth language from the
13 Acquisition Agreement that no amendment shall occur absent JPMorgan's prior written
14 approval.  Paragraph 127 alleges that through the Parents' "comprehensive and continuous
15 use of [their] management control and vetoes over [South Edge's] performance and
16 enforcement of its obligations," the Parents have "breached [their] fiduciary duties, as well
17 as [their] contractual and other duties, to Lenders under the Loan Documents, as well as to
18 Borrower under Defendants' Contract Collateral."  This general allegation of parental
19 control over a subsidiary is insufficient to support the factual contention that the Parents
20 directed or controlled the decisions regarding the takedown amendments.
21        Paragraph 57 of JPMorgan's proposed amended complaint identifies those parties
22 it alleges were involved in the amendments to the takedown schedule as the "Takedown
23 Fraud Defendants."  The Parents are not included in the list of Takedown Fraud
24 Defendants.  There is no factual allegation that the Parents directed the Members to amend
25 the takedown schedule.  JPMorgan therefore has not sufficiently alleged the Parents'
26 involvement in the amendments to the takedown schedule, and the Court will deny

amendment on this claim as to the Parents.

### 2. Fraud in the Inducement

Builders contend that South Edge, not the Builders, made the representations in the FA that JPMorgan now claims to be false because the FA was between JPMorgan and South Edge. Builders further argue the FA contained no misrepresentations, as it listed the default associated with failing to follow the takedown schedule. Builders contend that purporting to alter the takedown schedule is not a default, it is only the actual failure to take down the property at the scheduled time that constitutes default. Additionally, Builders contend the FA contained a catchall phrase which covered other defaults, which would include the amendments to the takedown schedule. Builders also claim they made no misrepresentation because they never have claimed that the purported amendments to the takedown schedule alter the terms of the Credit Agreement or otherwise modify any of the Loan Documents. Builders argue JPMorgan cannot plead reliance because it agreed to extend the takedown schedule in the FA. Finally, Builders argue JPMorgan has not and cannot plead damages.

JPMorgan argues Builders signed the FA, and thus had a duty to disclose the amendments to the takedown schedule. JPMorgan also argues the FA does not identify the amendments as among the specified defaults in the FA. JPMorgan contends the amendment without JPMorgan's consent is a default under the relevant agreements. JPMorgan also contends the Builders have argued the amendments alter the takedown schedule under the Acquisition Agreements, which affects JPMorgan's collateral and ability to collect on the loan. JPMorgan contends it pled reliance because it only agreed in the FA to a certain takedown extension for which it received consideration, it did not agree Builders unilaterally could alter the takedown schedule indefinitely. Finally, JPMorgan argues it has pled damages because it forewent its rights to collect during the forbearance period.

///

5

The elements of a claim for fraud in the inducement are: (1) the defendant made a false representation, (2) with knowledge or belief that the representation was false (or knowledge that it had an insufficient basis for making the representation), (3) with the intent to induce the plaintiff to consent to the contract's formation, (4) the plaintiff justifiably relied on the misrepresentation, and (5) the plaintiff suffered damages as a result. J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc., 89 P.3d 1009, 1018 (Nev. 2004). In the context of an intentional misrepresentation claim, Nevada has equated a false representation with "the suppression or omission of a material fact which a party is bound in good faith to disclose." Nelson v. Heer, 163 P.3d 420, 426 (Nev. 2007) (quotation omitted). Fraud in the inducement must be proven by clear and convincing evidence. J.A. Jones Contr. Co., 89 P.3d at 1018.

          a. Who Made the Alleged Misrepresentations?

The FA is "by and among" South Edge, the various Builders and their Parents, and JPMorgan. JPMorgan identifies three alleged misrepresentations: (1) JPMorgan argues Section 3(d) of the FA was false because it stated that takedowns were "currently scheduled for April 15, 2008," when in fact three times prior to signing the FA, Builders had agreed to extend the schedule; (2) JPMorgan argues Section 15(a) was false because it represented that as of the date of the FA, there were "no defaults or Events of Default . . . under the Loan Documents other than the Specified Defaults," when in fact there was another default in the form of the undisclosed modification of the takedown schedule; and (3) JPMorgan contends Section 15(b) of the FA represents that "the Loan Documents and the provision thereof . . . have not been modified, supplemented or waived" was a misrepresentation because Builders knew they had modified the takedown schedule. In addition to asserting these alleged misrepresentations, JPMorgan contends Builders induced JPMorgan to enter into the FA through a fraudulent omission by failing to inform JPMorgan of the modifications to the takedown schedule.

1     Section 3(d) of the FA does not attribute the statement "currently scheduled for
2  April 15, 2008" to any particular party.  Sections 15(a) and (b) are prefaced with the
3  statement that "Borrower," which is South Edge, represents the following statements.
4  JPMorgan thus does not allege facts supporting a plausible entitlement to relief that
5  Builders made any affirmative misrepresentations.  However, JPMorgan has alleged facts
6  supporting a plausible entitlement to relief based on an omission.  Builders signed the FA
7  knowing that they had amended the takedown schedule, but did not inform JPMorgan of
8  that fact despite statements in the FA which suggested the original takedown schedule still
9  was in effect.

                    b.  Is Amendment of the Schedule a Default?

11     Section 9.01 of the Credit Agreement sets forth Events of Default.  Section
12 9.01(d) provides that it is an Event of Default if South Edge "shall fail to observe or
13 perform any covenant, condition or agreement contained . . . in Article VII."  In Article VII,
14 Section 7.03(a) states that South Edge "shall not amend, modify or terminate any
15 Acquisition Agreement without the prior written approval of" JPMorgan.  The purported
16 amendments therefore are Events of Default.

                    c.  Did the FA Disclose All Defaults?

18     Section 15(a) of the FA provides that South Edge warrants that as of the date of
19 signing the FA, "there are no defaults or Events of Default . . . under the Loan Documents
20 other than the Specified Defaults."  The FA defines Specified Defaults as "any Default or
21 Event of Default arising solely with respect to the failure by a Member to complete its
22 scheduled Takedown on April 15, 2008."  The FA also defines Specified Defaults as "any
23 other Defaults or Events of Default existing as of the date hereof or which may arise during
24 the Forbearance Period (as defined below), other than any New Material Default."  The FA
25 defines New Material Default as, among other things, "any other Defaults or Events of

Default . . . involving the failure to pay money or that, individually or in the aggregate, would materially and adversely affect (1) the value of the Collateral, (2) the ability of the Agent or the Lenders to exercise remedies with respect to any Collateral or Guaranties, or (3) the timing of such remedies; provided, however, that a New Material Default shall not include any event with respect to a Member or Parent Guarantor which does not give rise to termination of this Forbearance Agreement under Section 5(e)." Section 5(e) refers to the voluntary or involuntary bankruptcy or appointment of a receiver for any Member or Parent Guarantor.

Amendment of the takedown schedule is a New Material Default because it would affect the collateral and would affect JPMorgan's remedies. If South Edge and the Members amend the Acquisition Agreement by extending the takedown schedule, it affects JPMorgan's ability to enforce the takedown schedule under the Acquisition Agreement, an agreement in which JPMorgan has a security interest.

        d. Reliance

JPMorgan contends it has pled reliance because when it agreed to the extension in the FA, it did so with knowledge and for consideration, for a determinate period of time. But what it did not know was that Builders were extending the takedown schedule without its knowledge, for no consideration, and in a manner that suggested the takedowns could be modified indefinitely in the future so that takedowns would never come due unless Builders wanted that result.

JPMorgan has alleged reliance sufficient to support amendment, as it has alleged it would not have agreed to forbear and negotiate further if it had known the Builders were taking the position they could change the takedown schedule at will and indefinitely put off the takedowns. That it agreed to a limited extension of the takedown schedule in exchange for some consideration does not mean it did not rely on the representations in the FA, and Builders' silence in the face of those representations, that the original takedown schedule

was in effect.

     e. Damages

  JPMorgan has alleged damages because it forbore under the FA, and thus extended the time frame for recovering its money. Whether JPMorgan will be able to establish its entitlement to such damages is not a proper inquiry at the amendment stage.

  JPMorgan has alleged facts supporting a plausible entitlement to relief for its intentional interference with contractual relations claim. This claim is not futile as against the Builders. However, the claim is futile as against the Parents for the reasons set forth above.

    3.  Payment Due Under the Limited Guaranty

  Builders argue this claim is futile because the Limited Guaranty is not triggered unless there is a fraudulent misrepresentation in the Loan Documents, and the FA is not a loan document as that term is defined in the Limited Guaranty. JPMorgan responds the Limited Guaranty is triggered by misrepresentations not only "in" the Loan Documents, but "under" the loan documents. JPMorgan contends that because the misrepresentations reference the Loan Documents, the misrepresentations were "under" the Loan Documents. JPMorgan also argues the FA is itself a Loan Document because it was delivered by Builders to JPMorgan pursuant to the Credit Agreement. JPMorgan further argues the Limited Guaranty is triggered by a fraudulent omission "in respect of the Loans or the Obligations," and the failure of Builders to advise JPMorgan of the amended takedown schedule is a fraudulent omission "in respect of" the loans or obligations.

  The contractual parties to the Limited Guarantees are the Members, the Parent Guarantors, and JPMorgan. The Members and Parents agreed to guarantee "any and all actual losses, costs, damages and expenses incurred" by JPMorgan "as a direct or indirect result of (i) any willful or fraudulent misrepresentation by the Parent Guarantor or the Member Guarantor under any Loan Documents; [or] (ii) any fraudulent or unlawful act or

1  omission of the Parent Guarantor or the Member Guarantor in respect of the Loans or the
2  Obligations or any of the Loan Documents to which such Parent Guarantor or Member
3  Guarantor is a party[.]"  The Limited Guarantees also provide that the Members and Parents
4  guaranty the same for any such acts by South Edge.
5         The Limited Guarantees provide that the capitalized terms have their meaning as
6  set forth in the Credit Agreement.  The Credit Agreement defines Loan Documents as "(a)
7  [the Credit Agreement], any Notes delivered pursuant hereto or the Original Credit
8  Agreement, the Guaranties, the Environmental Indemnity Agreement and the Collateral
9  Documents and (b) any and all other instruments or documents delivered or to be delivered
10 by the Credit Parties pursuant hereto or pursuant to any of the other documents described in
11 clause (a) above."  Loans are defined as "the loans made by the Lenders to the Borrowers
12 pursuant to this Agreement."  Obligations means "all Loans, LC Disbursements, advances,
13 debts, liabilities, obligations, covenants and duties owing by any Credit Party" to JPMorgan
14 or the other Lenders.
15        The FA is not a Loan Document because it was not delivered pursuant to the
16 Credit Agreement.  The FA requires South Edge and the Members to deliver the FA to the
17 other parties to the agreement, but it is the FA that requires delivery, not the Credit
18 Agreement.  Consequently, a misrepresentation made in the FA would not qualify as a
19 misrepresentation "under the Loan Documents."
20        However, the Limited Guarantees also are triggered by misrepresentations "in
21 respect of the Loans or the Obligations."  JPMorgan adequately has alleged a
22 misrepresentation "in respect of" the Loans or the Obligations by alleging Defendants, by
23 omission, misrepresented the takedown schedule or amendments thereto.  Additionally,
24 Defendants agreed the Limited Guaranty would be triggered by South Edge's
25 misrepresentations, and JPMorgan has alleged South Edge made affirmative
26 misrepresentations in the FA regarding the takedown schedule.  The takedown schedule is

10

related to the structuring of the loan and the Obligations thereunder.  As discussed above, amending the takedown schedule without JPMorgan's consent was a default under the Credit Agreement.  This claim therefore is not futile.

### 4.  Declaratory Relief

Builders argue this claim is not ripe because there presently is no dispute as to whether the internal vote to change the takedown schedules affected JPMorgan's rights under the Loan Documents, and in any event this issue will be addressed in JPMorgan's breach of contract claim.  JPMorgan responds that JPMorgan's rights are affected by any amendment to the schedules in the Acquisition Agreement because that agreement has been assigned to JPMorgan.  JPMorgan contends that any modification that would make payments due under the Acquisition Agreement perpetually changeable at the whim of the Builders affects JPMorgan's ability to collect on the loan.  JPMorgan thus claims it is entitled to know whether the purported amended takedowns are the actual schedule or whether the original takedown schedule controls.

To determine whether to hear a declaratory judgment claim, the Court first must determine whether there is an actual case or controversy within its jurisdiction.  Principal Life Ins. Co. v. Robinson, 394 F.3d 665, 669 (9th Cir. 2005).  To determine whether there is an actual case or controversy, the Court uses the same test for Article III cases or controversies.  Id.  "A claim is usually ripe if the issues raised are primarily legal, do not require further factual development, and the challenged action is final."  Center For Biological Diversity v. Kempthorne, 588 F.3d 701, 708 (9th Cir. 2009) (quotation omitted).  Additionally, the Court should consider "the fitness of the issues for judicial decision and . . . the hardship to the parties of withholding court consideration."  Id. (quotation omitted).

If the Court determines it has jurisdiction, the Court then must decide whether to exercise its jurisdiction.  Principal Life Ins. Co., 394 F.3d at 669.  To make this determination, the Court considers the following factors: (1) avoiding needless

determination of state law issues; (2) discouraging forum shopping; and (3) avoiding duplicative litigation.  Id. at 672.  The Court "must balance concerns of judicial administration, comity, and fairness to the litigants."  Id. (quotation omitted).  In addition to the above factors, the Court may consider:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems.  In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

Id.

A ripe controversy exists between the parties as to whether the amendments to the takedown schedule have any legal effect under any applicable agreement.  Although Builders contend that they do not dispute the amendment did not affect the Credit Agreement, Builders do not disclaim that the amendments affect the Acquisition Agreement.  Whether the amendments have any legal effect is primarily a legal question which will not require further factual development, and the challenged action is final.  There are no concerns here about avoiding needless determination of state law issues, discouraging forum shopping, or avoiding duplicative litigation.  Declaratory relief as to the amendments' legal effect will serve a useful purpose in clarifying the legal relations at issue.  The claim therefore is not futile or unnecessary.

### 5.  Punitive Damages

Builders contend there is no basis to add punitive damages relief to this action.  Because JPMorgan's fraudulent inducement claim is not futile, punitive damages likewise are not futile at this stage of the proceedings.

**B.  Undue Delay and Prejudice**

Builders argue JPMorgan unduly delayed amending because the extensions to the takedown schedule were discussed in a hearing many months ago, and were referenced in

documents produced in October 2009.  JPMorgan responds that it moved to amend within the time allotted in the Scheduling Order for amendment.  JPMorgan also contends it did not learn of all the facts supporting amendment until January 2010.  JPMorgan argues that passing references to amendments to the takedown schedule and unsigned votes to extend the schedule were insufficient to support amendment earlier.

JPMorgan moved to amend prior to the expiration of the deadline to move to amend.  JPMorgan's motion therefore is timely under the Scheduling Order.  The passing references to amendments which the Builders cite would not have sufficed for JPMorgan to assert its claims with the factual allegations necessary to support a plausible entitlement to relief.  Builders will not be prejudiced because the Court already has indicated it will solicit from the parties a new proposed discovery plan and scheduling order following the Court's ruling on certain motions submitted at the August 6, 2010 hearing.  (Mins. of Proceedings (Doc. #324).)  Thus, to the extent Builders need further discovery to address these new claims, they may propose extending the discovery deadline.

JPMorgan's motion to amend is not futile, unduly delayed, or prejudicial.  The Court therefore will grant the motion to amend.  JPMorgan must detach and file the amended complaint within ten (10) days of the date of this Order.

**C.  CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff JPMorgan Chase Bank, N.A.'s ("JPMorgan") Motion Seeking Leave to Amend the UCC Complaints Against the Home Builder Defendants (Doc. #228) is hereby GRANTED in part and DENIED in part.  The motion is denied as to proposed count one with respect to the Parent Defendants.  The motion is granted in all other respects.

///

///

///

IT IS FURTHER ORDERED that Plaintiff JPMorgan Chase Bank, N.A. shall file an amended complaint in compliance with this Order on or before October 12, 2010.

DATED: September 27, 2010

_____
PHILIP M. PRO
United States District Judge